726 F.2d 459
 33 Fair Empl.Prac.Cas. 441,
32 Empl. Prac. Dec. P 33,936,
1 Indiv.Empl.Rts.Cas. 299
Deborah Lynn THORNE, Plaintiff-Appellant, Cross-Appellee,
v.
CITY OF EL SEGUNDO, J.C. Devilbiss, James Johnson, and John
Hampton, Defendants-Appellees, Cross-Appellants.
 Nos. 80-5618, 80-5699.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 4, 1983.
Decided Nov. 21, 1983.
 
 Nathan Goldberg, Allred, Maroko & Goldberg, Los Angeles, Cal., for plaintiff-appellant, cross-appellee.
 Richard R. Terzian, Burke, Williams & Sorensen, Los Angeles, Cal., for defendants-appellees, cross-appellants.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, TANG, and FLETCHER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Appellant, Deborah Lynn Thorne, appeals from the district court's dismissal of her claim against defendants Devilbiss, Johnson, and Hampton under 42 U.S.C. Sec. 1983 for invasion of constitutionally protected privacy and associational interests, and from the court's adverse judgment, following a bench trial, on her sex discrimination claim against the City of El Segundo under Title VII, 42 U.S.C. Sec. 2000e et seq. The district court dismissed the section 1983 claim under Federal Rule of Civil Procedure 41(b) at the end of Thorne's case, on the ground that the evidence showed no right to relief. The court rejected the Title VII claim after trial on the grounds that Thorne had failed to establish a prima facie case of disparate treatment, and that, in any event, the City had demonstrated legitimate justification for its refusal to hire her. Thorne filed a timely appeal from the district court's judgment and jurisdiction in this court is proper under 28 U.S.C. Sec. 1291 (1976). We reverse both the district court's dismissal of appellant's section 1983 claim and the judgment on her Title VII claim.
 
 
 2
 * FACTS
 
 
 3
 The following basic facts are undisputed. At the time of trial, the City's police department had 83 officers, of whom only 2 were women. In the previous 9 years, only 3 women had been hired as officers, one of whom failed to pass the probationary period.
 
 
 4
 Thorne was hired by the City of El Segundo in December of 1973 as a clerk-typist in the police department, a position she continued to hold until she left the City's employment in November, 1978. In January of 1978, the City announced a closed (i.e., open only to permanent city employees) promotion examination for persons desiring to become officers on the city police force. At the time of the announcement, the examination consisted of written and oral components to be followed by psychological and polygraph testing and a background investigation. Thorne received the second highest score among the applicants on the combined oral and written tests. Another female applicant received the highest test score. The oral test consisted of interviews with three officers who judged applicants on qualities reflecting their experience and personal fitness for police work. All three rated Thorne as acceptable for appointment as a police officer. Thorne was listed as an eligible applicant on the applicant roster.
 
 
 5
 After the applicant rankings were published, the City announced that a successful applicant would have to pass a physical agility test. Thorne passed the agility test, which was scored on a pass/fail basis. She also passed the psychological screening. In his written report, the psychologist noted that although Thorne appeared slightly immature she was highly motivated and likely to work out well as a police officer.
 
 
 6
 In April of 1978, Thorne submitted to the polygraph testing required for police officer candidates. The administration and handling of the results of the polygraph test form the basis of her section 1983 claim for invasion of privacy. The polygraph examiner, defendant John Hampton, had been told by personnel officer James Antonius to look into what was described as a "possible discrepancy" between an application Thorne had filled out for another police department and her El Segundo application. One application reported a dilation and curettage and the other a hospitalization for a "female problem." On the questionnaire Thorne filled out before the polygraph examination, she reported that she had been pregnant and had suffered a miscarriage. Hampton questioned her about this event, and asked who the father of the child was. Thorne was reluctant to reveal the information and said it had been a former officer with the El Segundo police department. Upon further questioning, Thorne revealed that the father was actually a married officer still with the El Segundo police department. Thorne asked Hampton to keep this information confidential. Hampton questioned her further about possible relationships with other department personnel.[1] He warned that she might not be able to complete the rigorous program at the police academy, and suggested she think carefully before quitting her present job.
 
 
 7
 Hampton reported the information regarding Thorne's affair with the officer in a "confidential report" to Police Chief Johnson, who is also a defendant in this case. Hampton also reported that in his personal opinion Thorne lacked "sufficient aggressiveness, self-assuredness or probable physical ability to presently handle herself in stress situations." Sometime after receiving the information from Hampton, Chief Johnson had a meeting with Thorne in his office. He warned her that if she pursued her application, he could not guarantee the confidentiality of the information regarding her affair with the officer. After thinking it over, Thorne decided not to withdraw her application. Johnson gave the information to defendant Captain Devilbiss, who was assigned to complete the background investigation on Thorne that had been started by Officer Antonius.
 
 
 8
 After investigating Thorne's background, Antonius had indicated on the "applicant review checklist" that the results of his investigation were satisfactory in every category. On June 2, 1978, Devilbiss made his report to Captain Johnson. This report, which was not marked "confidential," discussed Thorne's affair with the officer and the resulting pregnancy and miscarriage. It also reported Hampton's conclusion that Thorne lacked sufficient "aggressiveness, self-assuredness, or probable physical ability." In summarizing the results of his investigation, Captain Devilbiss reported that although Thorne had a number of positive attributes, she was deficient for three reasons. First, she had a poor record of tardiness and sick time. Second, she had "barely passed" the physical agility test and was "a very feminine type person who is apparently very weak in the upper body." Third, Thorne had only a very recent interest in police work. Devilbiss concluded by recommending that Thorne be disqualified and the processing of the next applicant on the list be finalized.
 
 
 9
 Captain Johnson recommended to the City Manager's office that Thorne be disqualified, and on June 13, 1978, Thorne received a letter from the City Manager informing her that her name had been removed from the eligibility list. The City hired a male, Allison Graham, who had originally been ranked third on the eligibility list.[2] The City had processed Thorne's application before that of the first ranked applicant, Jeannie Metcalfe. Because of the delay in processing her application, Metcalfe feared that El Segundo would not offer her a job and she accepted a position as police officer in another city.[3]
 
 
 10
 On September 28, 1979, appellant filed this action alleging violations of 42 U.S.C. Sec. 1983 and Title VII, 42 U.S.C. Sec. 2000e et seq.[4] She named Police Captain Devilbiss, Police Chief Johnson and Mr. John Hampton, the polygraph examiner, as defendants in the 1983 suit and the City of El Segundo as the defendant in her Title VII action. The case went to trial in May of 1980. At trial, the basic facts were undisputed. However, many particulars of these events and their implications were the subject of conflicting testimony. At the end of Thorne's case-in-chief, the district court granted a defense motion for involuntary dismissal of plaintiff's section 1983 claim under Federal Rule of Civil Procedure 41(b). This rule permits dismissal of a claim where, under the applicable law and in view of the evidence presented, a plaintiff has failed to show a right to relief. At the close of the trial, the district court ruled in favor of the City on the Title VII claim because it found that Thorne had not established a prima facie case of discriminatory treatment and that defendants had articulated legitimate, nondiscriminatory reasons for not hiring her. On appeal, Thorne argues that the district court should not have dismissed her section 1983 claim and that the proof on her Title VII claim entitled her to judgment as a matter of law.
 
 II
 DISCUSSION
 
 11
 A. Thorne's Title VII Claim.
 
 
 12
 At trial, Thorne advanced a discriminatory treatment theory. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). She introduced evidence to show that the City refused to hire her because of its stereotyped views of the physical strength and ability of women and because those responsible for reviewing her application applied a different standard of moral integrity to her application than was applied to similarly situated males. After hearing all of the evidence, the district court rejected appellant's claim and ruled in favor of the City. Specifically, the trial court found:
 
 
 13
 Plaintiff failed to establish a prima facie case of employment discrimination in that she failed to show that she was qualified for the position offered .... Even if plaintiff had established a prima facie case, defendants articulated valid, non-discriminatory reasons for the failure to hire [her] ... The criteria upon which [Police Chief] Johnson made his determination [to disqualify] Plaintiff were objective factors such as Plaintiff's tardiness and sick time record as compared to the other candidates and subjective factors applied in good faith such as aggressiveness, self-assurance, motivation, candor and high moral standards.
 
 
 14
 The district court erred in concluding that Thorne failed to establish a prima facie case of discrimination. In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court described a typical model that would establish a prima facie case of discriminatory treatment. Under this model the plaintiff must show:
 
 
 15
 (i) That he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 16
 Id. at 802, 93 S.Ct. at 1824 (footnote omitted). The formula is not inflexible but must be applied in light of the facts in the specific case under adjudication. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54 n. 6, 101 S.Ct. 1089, 1093-94 n. 6, 67 L.Ed.2d 207 (1981). Moreover, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." Id. at 253, 101 S.Ct. at 1093.
 
 
 17
 Thorne easily met this burden. She is a member of a group protected by Title VII. She applied for a position as a police officer with the City. She ranked second among applicants on the oral and written tests for the job. She was rated qualified to be a police officer following psychological testing and she passed the physical agility test required of applicants. In addition, she submitted to the polygraph testing demanded by the police department and there is no indication that her answers on this test were unacceptable or false. Under these circumstances, the district court's finding that plaintiff was not qualified for the position of police officer was clearly erroneous.[5] See Lynn v. Regents of the University of California, 656 F.2d 1337, 1342 (9th Cir.1981) (applicant is qualified for position if he or she meets objective criteria for job); Hagans v. Andrus, 651 F.2d 622, 625 (9th Cir.1981) (same). Thorne was rejected for the police officer position and a male was ultimately hired. Thorne established each of the elements of a prima facie case of discriminatory treatment under the McDonnell-Douglas model. The district court's conclusion that she failed to carry her burden in this initial phase of the case is based on the erroneous finding that Thorne was not qualified and is patently wrong.
 
 
 18
 By establishing a prima facie case, appellant created a rebuttable "presumption that the employer unlawfully discriminated against" her. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. To rebut this presumption "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Id. at 255, 101 S.Ct. at 1094. In short, the defendant must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Id. at 254, 101 S.Ct. at 1094. See generally United States Postal Service Bd. of Governors v. Aikens, --- U.S. ----, 103 S.Ct. 1478, 1479, 1481, 75 L.Ed.2d 403 (1983).
 
 
 19
 We agree with the district court's conclusion that the City met this burden of production by presenting evidence that Thorne was disqualified for non-discriminatory reasons such as tardiness and psychological factors. However, our inquiry at this stage in the proceeding is whether this evidence, in the face of Thorne's contrary evidence that discriminatory reasons were the actual basis for her rejection, was sufficient to support the trial court's judgment in favor of the City. We conclude that it was not.
 
 
 20
 At the third and final stage of a discriminatory treatment case, as outlined recently in Aikens, 103 S.Ct. at 1482, the plaintiff must carry the ultimate burden of proving intentional discrimination. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095, quoted in Aikens, 103 S.Ct. at 1482. In this case, the thrust of Thorne's proof was to show both that the City's articulated reasons for not hiring her were a pretext for discrimination and that the real reasons she was rejected were the defendants' sex-based physical stereotype of women and a standard of moral integrity that was applied only to women.
 
 
 21
 The district court rejected Thorne's proof of discrimination, concluding that defendants disqualified her for nondiscriminatory reasons that were not pretextual. A review of the exhibits and the transcript in this case leads us to form the firm conviction that the district court was clearly erroneous in its conclusion that appellant was rejected for nondiscriminatory reasons that were not pretextual.[6]
 
 
 22
 Thorne introduced evidence to show that the alleged nondiscriminatory reasons for which defendants argue she was rejected were a pretext to mask the actual, discriminatory reasons for their refusal to hire her. The evidence is overwhelming that defendants had a stereotyped view of the physical abilities of women which they applied to Thorne. Captain Devilbiss testified that an important factor in his recommendation against appellant was his perception that she lacked sufficient strength to work as a police officer. The following excerpt from his testimony demonstrates that his opinion regarding Thorne's physical abilities was not based on any facts, but on his preconceived ideas about women:
 
 
 23
 Q. [By plaintiff's counsel]: Now you also indicate in that same summary [Exhibit 10] that, quote, she is a very feminine type person who is apparently very weak in her upper body, unquote. Now were you basing that on your intuitive feeling?
 
 
 24
 A. [By Capt. Devilbiss]: Well, I have known Debbie for about--when she was working at the P.D. for about four and a half years. And that was an observation I had made over those years.
 
 
 25
 Q. What in those four years ... did she do or not do that caused you to believe that she was apparently very weak in her upper body?
 
 
 26
 A. Just from her physical appearance.
 
 
 27
 Q. Is there ever any occasion where she was not able to lift something or do something in the department because of lack of strength?
 
 
 28
 A. Not that I am aware of.
 
 
 29
 Q. What did you mean when you said that she was a very feminine type person?
 
 
 30
 A. Girlish, feminine as opposed to masculine.
 
 
 31
 Q. Do you recall I took your deposition, Captain?
 
 
 32
 A. Yes, I recall.
 
 
 33
 Q. Reading from page 36, line 3, question: "You indicated that she appears to be a very feminine type person who lacks upper body strength. A: Feminine in regard to not being as strong as a male, perhaps." Does that refresh your recollection as to what you meant by feminine?
 
 
 34
 A. If that is what I said, yes.
 
 
 35
 Q. Do you feel that women generally are strong enough to be police officers?
 
 
 36
 A. Generally speaking, no.
 
 
 37
 Mr. Hampton shared Captain Devilbiss's evaluation of plaintiff's physical abilities and communicated this evaluation to Chief Johnson in one of his reports:
 
 
 38
 I would, as in my general resume, suggest a reserve officer position ... as I do not believe she could maintain the physical requirements.... I am certain that she would never physically complete a regular police academy. This is the reason that I talked to her at length about maintaining her present position until she really proved herself.
 
 
 39
 Chief Johnson in turn relied on this information in making his decision not to hire plaintiff. Yet, both Johnson and Devilbiss were aware that Thorne had passed the physical agility test. Based on this review of the record, we can only conclude that plaintiff's rejection was, at least in part, based on the perception shared by those charged with reviewing her application that because of her sex she was physically unable to perform as a police officer.
 
 
 40
 The district court's finding that defendants did not reject Thorne because of the information they uncovered regarding her sexual history also flies in the face of the overwhelming weight of the evidence.[7] Both Johnson and Devilbiss admitted that it was a factor in their evaluation of Thorne, and defendants concede in their brief that the affair with the officer was considered.[8]
 
 
 41
 We also conclude that Thorne demonstrated that the moral standard which allowed her affair to be a factor in the City's decision not to hire her was not applied equally to men and women. Trial testimony established that this affair was conducted during off-duty hours, did not interfere with her job performance, and had not become a source of scandal within the department. More importantly, the trial court found that the City had no authority to discipline the officer involved for his role in the affair. The fact that the affair, nonetheless, was an actual reason for the decision not to hire Thorne, a woman, is grounds for an inference that different moral standards were applied to women and men. See Gerdom v. Continental Airlines, Inc., 692 F.2d 602, 609 (9th Cir.1982) (unequal treatment of different sexes in same employment context is significant evidence of sex-based discrimination).
 
 
 42
 The nondiscriminatory reasons offered by the City and accepted by the district court to justify the refusal to hire appellant are simply incredible and clearly pretextual. These reasons were Thorne's alleged lack of aggressiveness, self-assurance, motivation, candor, and moral standards, plus an unacceptable record of sick leave use and tardiness.
 
 
 43
 There is no indication that Thorne lacked candor. The polygraph examiner found her truthful. Neither Johnson nor Devilbiss testified that Thorne lacked candor or that this was a factor in their evaluation of her.
 
 
 44
 The only testimony that relates to Thorne's lack of aggressiveness, confidence and motivation is that of Chief Johnson, who testified that these qualities were important to success as a police officer. Yet there is nothing more than an unspoken inference that Thorne lacked these traits. Nowhere did Chief Johnson testify that he found Thorne unaggressive, insecure or unmotivated. Nor did Captain Devilbiss testify that Thorne lacked these qualities. Only Hampton's report of the polygraph examination, repeated in Captain Devilbiss's report to Chief Johnson, mentions any of these factors. In his confidential report to Johnson, Hampton stated:
 
 
 45
 Applicant appears personable, intelligent, well-mannered and able to communicate with others. She admits that she has been drifting along without any goals until recently.... My personal opinion is that she does not display sufficient aggressiveness, self-assuredness or probable physical ability to presently handle herself in stress situations.
 
 
 46
 Hampton testified that by "aggressiveness," he meant she had not been aggressive enough in her pursuit of police work. There is, however, no evidence in the record to show that Mr. Hampton was qualified to perform a psychological examination of Thorne. The psychologist hired by the City to evaluate Thorne recommended that she be hired. His report noted that she had "high motivation." One of the factors considered by the three oral examiners who tested Thorne was her interest in police work. Although all three noted that her interest in police work was recent, all three rated her as an acceptable candidate. Johnson's and Devilbiss's rejection of the evaluations of those chosen by the City to evaluate Thorne's psychological capability in favor of the impressions of a polygraph examiner (who merely expressed doubts and did not even go so far as to recommend Thorne be disqualified) casts doubt on the bona fides of these criteria as a basis for their decision.
 
 
 47
 We reach a similar conclusion with respect to the other reason proffered by the defendants for not hiring appellant. Although Thorne's performance reviews for the years before the 1977-78 rating year indicated problems with use of sick time and tardiness, they also showed continuing efforts to improve. Attendance may be a legitimate factor in an employment decision, but the circumstances of this case demonstrate that any decision made to disqualify Thorne on this basis was not made in good faith. First, neither Devilbiss nor Johnson made any attempt to discuss Thorne's performance with her current supervisor, who rated her as acceptable in promptness and attendance for the year just prior to her application. Second, Johnson himself recognized that Thorne's tardiness (averaging 5 to 7 minutes, twice a week) had been tolerated by her supervisors; thus, there was no basis to expect a continuation of this behavior in a job where it would not be tolerated. Third, Antonius testified that tardiness and sick leave records were not a normal part of the background investigation, casting considerable doubt on Johnson's testimony that this was an important factor in his decision. This is supported by the fact that while at trial defendants presented a comparison of Thorne's attendance record with those of the other two applicants, there was no evidence that this comparison had been made at the time Thorne was rejected. Accordingly, we cannot accept the finding that Chief Johnson considered, as a legitimate reason for rejecting Thorne, her tardiness and sick time records.
 
 
 48
 The evidence in the record is more than sufficient to justify the legal conclusion that, in fact, Thorne was rejected because of intentional discrimination in violation of Title VII. A refusal to hire a woman because of a sex-stereotyped view of her physical abilities is the kind of invidious discrimination that violates Title VII. See Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1224-25 (9th Cir.1971). Similarly, application to women of a standard of moral integrity that is not applied equally to men violates Title VII. See Gerdom, 692 F.2d at 608-09. Thorne's evidence was sufficient to prove that sex-stereotyping and unequal job standards were applied to her.
 
 
 49
 The district court's judgment against Thorne on her Title VII claim is, therefore, reversed. The case is remanded to the district court for entry of judgment in Thorne's favor on her Title VII claim, and for an award of appropriate relief.
 
 
 50
 B. Thorne's Section 1983 Claim.
 
 
 51
 Thorne claims violations of 42 U.S.C. Sec. 1983 by three individual defendants, Devilbiss, Johnson, and Hampton. She introduced evidence that, she argues, proved that the administration and handling of the polygraph examination and its results by the individual defendants invaded her constitutionally protected rights of privacy and free association and that these infringements were accomplished under color of state law. On this aspect of the case the district court granted defendants' motion under Federal Rule of Civil Procedure 41(b) for involuntary dismissal at the close of plaintiff's evidence. We review the dismissal as we would a judgment in defendants' favor following a trial to the court. See Wilson v. United States, 645 F.2d 728, 730 (9th Cir.1981). Findings of fact are reviewed for clear error; id.; legal conclusions are reviewed under a de novo standard. In this case, we find that the district court erred both in its findings of fact and in its conclusions of law.
 
 
 52
 The constitution protects two kinds of privacy interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). Both are implicated in this case. Thorne presented evidence that defendants invaded her right to privacy by forcing her to disclose information regarding personal sexual matters. She also showed that they refused to hire her as a police officer based in part on her prior sexual activities, thus interfering with her privacy interest and her freedom of association.
 
 
 53
 The interests Thorne raises in the privacy of her sexual activities are within the zone protected by the constitution. This conclusion follows from the cases holding that such basic matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion. See Kelley v. Johnson, 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1970); Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
 
 
 54
 The evidence shows that Thorne's employment was indeed conditioned on her answering questions regarding her sexual associations. Before the polygraph examination, Thorne was given forms explaining the procedure and the questionnaires she was to fill out. Although one form informed her that she could refuse to answer questions, another warned that reluctance to answer personal questions would be interpreted by the examiner as an indication of serious emotional or sexual problems. Hampton himself noticed that Thorne was reluctant to discuss her affair with the officer. Under these circumstances, it is impossible to conclude that Thorne's participation in the polygraph examination was anything other than a necessary condition of her employment as a police officer.
 
 
 55
 A potential employee of the state may not be required to forego his or her constitutionally protected rights simply to gain the benefits of state employment. See, e.g., Kelley, 425 U.S. at 245, 96 S.Ct. at 1444; Elrod v. Burns, 427 U.S. at 347, 357-59, 96 S.Ct. at 2673, 2681-82, 49 L.Ed.2d 547 (1976). The more fundamental the rights on which the state's activities encroach, the more weighty must be the state's interest in pursuing that course of conduct. Compare Moore v. City of East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (holding that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interest advanced and the extent to which they are served by the challenged regulation") with Kelley, 425 U.S. at 245, 96 S.Ct. at 1444 (asserted substantive liberty interest of police officer in matters of personal appearance assumed to be protected by fourteenth amendment, but state interests underlying infringing regulation only subjected to rational relation test). In this case the inquiry by the City of El Segundo that appellant challenges under section 1983 bears on those matters acknowledged to be at the core of the rights protected by the constitution's guarantees of privacy and free association--appellant's interest in family living arrangements, procreation and marriage. See, e.g., Briggs v. North Muskegon Police Department, 563 F.Supp. 585 (W.D.Mich.1983) (sustaining police officer's challenge to city's termination of his employment because of his cohabitation with a woman to whom he was not married). Accordingly, the City must show that its inquiry into appellant's sex life was justified by the legitimate interests of the police department, that the inquiry was narrowly tailored to meet those legitimate interests, and that the department's use of the information it obtained about appellant's sexual history was proper in light of the state's interests.
 
 
 56
 Defendants' own evidence shows a sufficient invasion of Thorne's privacy interests to require justification. The information about the polygraph examination given to Thorne indicated that questioning about sexual behavior would be a significant part of the overall examination. Indeed a specific page of instructions was devoted to the importance of answering questions about sex. These instructions, in part, state:
 
 
 57
 There are many psychological sexual problems created because of one's religious, moral or other standards. Some of these problems may form the basis of a deviancy that could materially affect one's ability to properly function as an employee of a law enforcement agency.
 
 
 58
 [T]his [psychological sexual problem] is a major problem area in the overall interview. On-the-job sexual or perverted deviancies can be cause for termination of employed personnel.
 
 
 59
 Hampton admitted he inquired into any social or sexual relations Thorne may have had within the police department, whether on duty or off. He pressed her to name the father of the child she lost.
 
 
 60
 Defendants attempted to link questions about an applicant's sexual history to his or her ability to perform as a police officer. The district court found that "[s]exual relations among officers in a paramilitary organization such as a police department are an appropriate matter of inquiry with respect to employment in light of their possible adverse effect on morale, assignments, and the command-subordinate relationship." This may be true. However, the inquiry in this case was not limited to this sort of information. Hampton was quite clearly concerned with whether Thorne had had an abortion, a matter totally irrelevant to "onthe-job sex."[9] The only other alleged justification for inquiry into an applicant's sexual activities was a concern for discovering "deviancies." Hampton's questions regarding a possible pregnancy and abortion and the identity of Thorne's sexual partners were not directed toward discovering "deviancies," and none were in fact discovered.
 
 
 61
 We do not hold that the City is prohibited by the constitution from questioning or considering the sexual morality of its employees.[10] If the City chooses to regulate its employees in this area or to set standards for job applicants it may do so only through regulations carefully tailored to meet the City's specified needs. The evidence established here that the City had no policy. Rather, Johnson testified that he simply applied the moral standards of the general society, as he saw them. Moreover, Hampton's questioning in the area of sexual activity was not regulated in any way. He was given free reign to inquire into any area he chose.
 
 
 62
 The City set no standards, guidelines, definitions or limitations, other than the polygraph examiner's own personal opinion, as to what might be relevant to job performance in a particular case. When the state's questions directly intrude on the core of a person's constitutionally protected privacy and associational interests, as the questioning of the polygraph examiner did in this case, an unbounded, standardless inquiry, even if founded upon a legitimate state interest, cannot withstand the heightened scrutiny with which we must view the state's action. We cannot even bestow legitimacy on the defendants' search for "perverted deviancies" in this case, because of the complete lack of standards for the inquiry. The risk that an infringement of an important constitutionally protected right might be justified on the basis of individual bias and disapproval of the protected conduct is too great. The very purpose of constitutional protection of individual liberties is to prevent such majoritarian or capricious coercion. See United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); see also Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) ("one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones."); see generally, L. Tribe, American Constitutional Law 569-577 (1978).
 
 
 63
 Even had the questions in this case been permissible, the use of the information in the decision to disqualify Thorne was not. In the course of the polygraph examination, defendants discovered that Thorne had engaged in an affair with an officer of the El Segundo police force. The affair had resulted in her pregnancy and a subsequent miscarriage. Thorne indicated that the affair had ended. This information was communicated to the Chief of Police in reports by both Hampton and Devilbiss. Hampton's report indicated that appellant "revealed the above information, as she wanted to be truthful as to the polygraph examination," and the examiner concluded that the information did not reveal "any sexual deviant behavior." Nonetheless, one of the reasons Chief Johnson decided that Thorne should not be hired was her affair with an officer on the police force.
 
 
 64
 In the absence of any showing that private, off-duty, personal activities of the type protected by the constitutional guarantees of privacy and free association have an impact upon an applicant's on-the-job performance, and of specific policies with narrow implementing regulations, we hold that reliance on these private non-job-related considerations by the state in rejecting an applicant for employment violates the applicant's protected constitutional interests and cannot be upheld under any level of scrutiny. See, e.g., Moore v. City of East Cleveland, 431 U.S. at 499, 97 S.Ct. at 1935 (heightened scrutiny where more substantial privacy interests implicated); Kelley v. Johnson, 425 U.S. at 245, 96 S.Ct. at 1444 (minimal scrutiny where minimal interests involved). In this case, defendants have never attempted to introduce evidence that would show that appellant's affair with a police officer before becoming a police officer, herself, affected or could potentially affect her job performance. The interests defendants alleged to justify a concern with applicants' sexual histories are not implicated in this case. There was no indication of any sexual deviance. The affair was not a matter of public knowledge, and could not therefore diminish the department's reputation in the community. There was no reason to believe Thorne would engage in such affairs while on duty, or that the affair which had ended was likely to revive or cause morale problems within the department. Thorne's conduct would not be a ground for discipline of a police officer, nor had any disciplinary measures against the officer involved been attempted.
 
 
 65
 Accordingly, we must conclude that the district court erred in finding that neither the questioning of appellant regarding her sex life nor reliance on the information obtained about her sex life violated her privacy and associational interests. See, e.g., Briggs v. North Muskegon Police Department, 563 F.Supp. at 591 (holding that dismissal of police officer violated officer's constitutional rights in the absence of a showing that cohabitation affected job performance); Shuman v. City of Philadelphia, 470 F.Supp. 449, 459 (E.D.Pa.1979) (holding that regulations permitting inquiry into off-duty relationship of police officers exceed scope of state's legitimate interests and violated officer's constitutional rights). Because the district court erred in dismissing Thorne's section 1983 claim under Federal Rule of Civil Procedure 41(b), we vacate that portion of the judgment and remand for further proceedings as the district court may find necessary.[11] Judgment should be entered for Thorne on her Title VII claim. In light of the full presentation of evidence in the Title VII action, it would appear the only material evidence defendants may offer on remand of the 1983 action is evidence to prove that they are entitled to qualified good-faith immunity.
 
 
 66
 The district court will have to determine the amount of damages in both the Title VII and the section 1983 actions. We point out that the court's finding that Thorne had presented no credible evidence of damages is clearly erroneous. At a minimum, she has lost the wages she would have received as a police officer. Thorne also testified that she suffered emotional distress, humiliation, and loss of sleep due to defendants' actions, damages which defendants concede are available under section 1983.[12]
 
 
 67
 REVERSED and REMANDED.
 
 
 
 [1]
 Thorne testified that she was also asked a large number of questions about her sexual activities, including when she had first had sex, with whom, etc. She also said she had filled out a questionnaire page on her sexual activities. This questionnaire page was not produced at trial, and Hampton disputed Thorne's version of the interview, claiming he had only asked her sexual questions regarding her associations with police officers
 
 
 [2]
 The city hired under what is termed a "rule of three," meaning that the top three applicants on the job roster were considered for an open position without any guarantee that the top applicant could be hired first. Usually, however, the top applicant was hired first. Those remaining on the roster would be eligible for future openings
 
 
 [3]
 Metcalfe testified that Johnson informed her that he would only consider her application if she withdrew pending applications for police officer jobs with other cities. Such a condition apparently was not uniformly required of police officer applicants. She also said Johnson told her that even if she withdrew her other applications she could not be guaranteed the El Segundo job. Metcalfe testified that she felt the City was not willing to hire a woman. She refused to withdraw her other applications and was hired as a police officer by another city. She was never offered a job with the El Segundo Police Department
 
 
 [4]
 Plaintiff filed an administrative complaint with the Equal Employment Opportunity Commission in November of 1978, and received her right-to-sue letter in July of 1979. See 42 U.S.C. Sec. 2000e-5(f)
 
 
 [5]
 We apply the clearly erroneous standard of review to questions of whether a party has established the factual elements of a prima facie case. See Gay v. Waiters' and Dairy Lunchmen's Union, 694 F.2d 531, 542-45 & n. 13 (9th Cir.1982):
 [t]he district court's findings on what facts were established by a preponderance of the evidence must be accepted on appeal unless clearly erroneous, but ... the court's determination whether the facts so proved were sufficient to establish an inference of discrimination, in other words whether the plaintiff's proof established a prima facie case thus shifting the burden of production to the defendant, is a legal conclusion freely reviewable on appeal.
 694 F.2d at 540.
 
 
 [6]
 As the court noted in Gay, we need not decide whether this is the correct standard of review because if we find the district court's conclusion clearly erroneous we would obviously set it aside under the less deferential de novo standard. See Gay, 694 F.2d at 545-46
 
 
 [7]
 For example, Chief Johnson testified as follows:
 Q. [By plaintiff's counsel]: What about the fact that she had an affair with an officer on the department, was that considered [in the decision not to hire plaintiff]?
 A. [By Chief Johnson]: It was considered.
 Q. That was one of the reasons that you ultimately decided to recommend against her hiring, was it not?
 A. It was a consideration.
 The only evidence in the record that supports the district court's finding is an isolated statement by Chief Johnson to the effect that at Thorne's unemployment compensation hearing he had told the hearing officer that he would not have hired Thorne regardless of her affair with the police officer. However, Captain Devilbiss testified that one of the reasons he recommended to Chief Johnson that Thorne not be hired was her affair, and it is undisputed that Chief Johnson relied on Captain Devilbiss's recommendation in deciding not to hire her.
 
 
 [8]
 Our conclusion is corroborated by internal inconsistencies in the district court's findings. First, it found that appellant was not rejected because of her affair with the officer, then it found that she was rejected because she lacked sufficient moral integrity. The only evidence in the record that could relate to moral integrity, however, is the evidence of her affair. There is, for example, no evidence that Thorne was not honest or lacked other traits that might bear on her moral integrity
 
 
 [9]
 Although there was much discussion at trial of a "discrepancy" in Thorne's applications there is no basis at all for the trial court's finding that "Plaintiff had submitted a personal history statement which failed to disclose the termination of her pregnancy ... and which was significantly at variance with her explanation of the same incident on a contemporaneous employment application which she had filed" with another department. Thorne reported a "DNC" on one form and a "female problem" on another. It is impossible rationally to read this as a "discrepancy" requiring investigation. The El Segundo application did not ask about pregnancy or miscarriage. On the questionnaire Thorne filled out before her polygraph exam she reported a pregnancy and miscarriage. There is no basis here for a contention that inquiry into this area was justified by a concern over whether Thorne was being truthful. Hampton himself testified that he wanted to see if Thorne would report an "abortion" and in his written reports discussed Thorne's "abortion." Thorne testified that she had had a miscarriage
 
 
 [10]
 See, e.g., Akron v. Akron Center for Reproductive Health, --- U.S. ----, 103 S.Ct. 2481, 2491, 76 L.Ed.2d 687 (1983). ("[I]t cannot be gainsaid that the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). (If the state has a heightened interest in regulating the speech of its employees--conduct at the core of the first amendment--"there is surely even more room for restrictive regulations of state employees where the claim implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment.") Kelley v. Johnson, 425 U.S. at 245, 96 S.Ct. at 1444. In Kelley, the Supreme Court upheld a police department's hair length regulation against a challenge on first and fourteenth amendment grounds. Id. at 247-48, 96 S.Ct. at 1445-46. In the wake of that decision, other courts have noted that the state's interest in regulating the conduct of its employees is perhaps at its greatest where paramilitary organizations, such as a police force, are involved. See, e.g., Shawgo v. Spradlin, 701 F.2d 470 at 482-83
 
 
 [11]
 On appeal, defendant Hampton argues that he cannot be liable in the 1983 action because he acted as an independent contractor rather than a state employee. Hampton argues, citing Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), that as a private person, he is not liable under Sec. 1983 unless plaintiff proves a conspiracy between state officials and himself. There is nothing in the record to support the contention that Hampton was not acting under color of law. In administering the polygraph examination, Hampton acted on the City's behalf and was paid by the City. See Griffin v. Maryland, 378 U.S. 130, 135, 84 S.Ct. 1770, 1772, 12 L.Ed.2d 754 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action."). A conspiracy with City officials must be shown only where, as in Dennis, the defendant has not otherwise acted under color of law
 
 
 [12]
 The cross-appeal is mooted by the result in 80-5618