**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT M. NELSON; WILLIAM
BRUCE BRANERDT; JULIA BELL;
JOSETTE BELLAN; DENNIS V.
BYRNES; GEORGE CARLISLE; KENT
ROBERT CROSSIN; LARRY R.
D'ADDARIO; RILEY M. DUREN;
PETER R. EISENHARDT; SUSAN D.J.
FOSTER; MATTHEW P. GOLOMBEK;
VAROUJAN GORJIAN; ZAREH
GORJIAN; ROBERT J. HAW; JAMES
KULLECK; SHARLON L. LAUBACH;
CHRISTIAN A. LINDENSMITH;
AMANDA MAINZER; SCOTT
MAXWELL; TIMOTHY P. MCELRATH;
SUSAN PARADISE; KONSTANTIN
PENANEN; CELESTE M. SATTER;
PETER M. B. SHAMES; AMY SNYDER
HALE; WILLIAM JOHN WALKER;
PAUL R. WEISSMAN,
            *Plaintiffs-Appellants,*

                v.

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION, an Agency of the
United States; MICHAEL GRIFFIN,
Director of NASA, in his official
capacity only; UNITED STATES
DEPARTMENT OF COMMERCE;

No. 07-56424

D.C. No.
CV-07-05669-ODW

OPINION

625

CARLOS M. GUTIERREZ, Secretary
of Commerce, in his official
capacity only; CALIFORNIA
INSTITUTE OF TECHNOLOGY,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
December 5, 2007—Pasadena, California

Filed January 11, 2008

Before: David R. Thompson and Kim McLane Wardlaw,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Wardlaw

---

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

**COUNSEL**

Dan Stormer and Virginia Keeny, Law Offices of Hadsell & Stormer, Inc., Pasadena, California, for the plaintiffs-appellants.

Mark B. Stern and Dana Martin, U.S. Department of Justice, Appellate Staff Civil Division, Washington, D.C., and Mark Holscher, R. Alexander Pilmer, and Mark T. Cramer, Kirkland & Ellis LLP, Los Angeles, California, for the defendants-appellees.

---

**OPINION**

WARDLAW, Circuit Judge:

The named appellants in this action ("Appellants") are scientists, engineers, and administrative support personnel at the Jet Propulsion Laboratory ("JPL"), a research laboratory run jointly by the National Aeronautics and Space Administration ("NASA") and the California Institute of Technology ("Caltech"). Appellants sued NASA, Caltech, and the Department of Commerce (collectively "Appellees"), challenging NASA's recently adopted requirement that "low risk" contract employees like themselves submit to in-depth background investigations. The district court denied Appellants' request for a preliminary injunction, finding they were unlikely to succeed on the merits and unable to demonstrate irreparable harm. Because Appellants raise serious legal and constitutional questions and because the balance of hardships tips sharply in their favor, we reverse and remand.

**I**

JPL is located on federally owned land, but operated entirely by Caltech pursuant to a contract with NASA. Like

all JPL personnel, Appellants are employed by Caltech, not the government. Appellants are designated by the government as "low risk" contract employees. They do not work with classified material.

Appellants contest NASA's newly instated procedures requiring "low risk" JPL personnel to yield to broad background investigations as a condition of retaining access to JPL's facilities. NASA's new policy requires that every JPL employee undergo a National Agency Check with Inquiries (NACI), the same background investigation required of government civil service employees, before he or she can obtain an identification badge needed for access to JPL's facilities. The NACI investigation requires the applicant to complete and submit Standard Form 85 (SF 85), which asks for (1) background information, including residential, educational, employment, and military histories, (2) the names of three references that "know you well," and (3) disclosure of any illegal drug use within the past year, along with any treatment or counseling received for such use. This information is then checked against four government databases: (1) Security/ Suitability Investigations Index; (2) the Defense Clearance and Investigation Index; (3) the FBI Name Check; and (4) the FBI National Criminal History Fingerprint Check. Finally, SF 85 requires the applicant to sign an "Authorization for Release of Information" that authorizes the government to collect "any information relating to [his or her] activities from schools, residential management agents, employers, criminal justice agencies, retail business establishments, or other sources of information." The information sought "may include, but is not limited to, [the applicant's] academic, residential, achievement, performance, attendance, disciplinary, employment history, and criminal history record information."[1] The record is vague as to the exact extent to and manner in

---

[1]The form also notes that "for some information, a separate specific release will be needed," but does not explain what types of information will require a separate release.

which the government will seek this information, but it is undisputed that each of the applicants' references, employers, and landlords will be sent an "Investigative Request for Personal Information" (Form 42), which asks whether the recipient has "any reason to question [the applicant's] honesty or trustworthiness" or has "any adverse information about [the applicant's] employment, residence, or activities" concerning "violations of law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," "general behavior or conduct," or "other matters." The recipient is asked to explain any adverse information noted on the form. Once the information has been collected, NASA and the federal Office of Personnel Management determine whether the employee is "suitable" for continued access to NASA's facilities, though the exact mechanics of this suitability determination are in dispute.[2]

Since it was first created in 1958, NASA, like all other federal agencies, has conducted NACI investigations of its civil servant employees but not of its contract employees. Around the year 2000, however, NASA "determined that the incomplete screening of contractor employees posed a security vulnerability for the agency" and began to consider requiring NACI investigations for contract employees as well. In

---

[2]Appellants claim that the factors used in the suitability determination were set forth in a document, temporarily posted on JPL's internal website, labeled the "Issue Characterization Chart." The document identifies within categories designated "A" through "D" "[i]nfrequent, irregular, but deliberate delinquency in meeting financial obligations," "[p]attern of irresponsibility as reflected in . . . credit history," "carnal knowledge," "sodomy," "incest," "abusive language," "unlawful assembly," "attitude," "homosexuality . . . when indications are present of possible susceptibility to coercion or blackmail," "physical health issues," "mental, emotional, psychological, or psychiatric issues," "issues . . . that relate to an associate of the person under investigation," and "issues . . . that relate to a relative of the person under investigation." NASA neither concedes nor denies that these factors are considered as part of its suitability analysis; instead, it suggests that Appellants have not sufficiently proved that such factors will play a role in any individual case.

November 2005, revisions to NASA's Security Program Procedural Requirements imposed the same baseline NACI investigation for all employees, civil servant or contractor. These changes were not made applicable to JPL employees until January 29, 2007, when NASA modified its contract with Caltech to include the requirement. Caltech vigorously opposed the change, but NASA invoked its contractual right to unilaterally modify the contract and directed Caltech to comply immediately with the modifications. Caltech subsequently adopted a policy—not required by NASA—that all JPL employees who did not successfully complete the NACI process so as to receive a federal identification badge would be deemed to have voluntarily resigned their Caltech employment.

On August 30, 2007, Appellants filed suit alleging, both individually and on behalf of the class of JPL employees in non-sensitive or "low risk" positions, that NASA's newly imposed background investigations are unlawful. Appellants bring three primary claims: (1) NASA and the Department of Commerce (collectively "Federal Appellees") violated the Administrative Procedure Act ("APA") by acting without statutory authority in imposing the investigations on contract employees; (2) the investigations violate their constitutional right to informational privacy; and (3) the investigations constitute unreasonable searches prohibited by the Fourth Amendment.

On September 24, 2007, Appellants moved for a preliminary injunction against the new policy on the basis that any JPL worker who failed to submit an SF 85 questionnaire by October 5, 2007 would be summarily terminated. The district court denied Appellants' request. It divided Appellants' claims into two categories—those challenging the SF 85 questionnaire itself and those challenging the grounds upon which an employee might be deemed unsuitable—and found that the challenges to the suitability determination were highly speculative and unripe for judicial review. The court rejected

Appellants' APA claim, finding statutory support for the investigations in the National Aeronautics and Space Act of 1958 (the "Space Act"), which allows NASA to establish security requirements as deemed "necessary in the interest of the national security." 42 U.S.C. § 2455(a). Limiting its review to the SF 85 questionnaire, the court found the form implicated the constitutional right to informational privacy but was narrowly tailored to further the government's legitimate security interest. Finally, the court rejected Appellants' Fourth Amendment argument, holding that a background investigation was not a "search" within the meaning of the Fourth Amendment. After concluding that Appellants had little chance of success on the merits, the district court also found that they could not demonstrate irreparable injury, because any unlawful denial of access from JPL could be remedied post hoc through compensatory relief.

On appeal, a motions panel of our court granted a temporary injunction pending a merits determination of the denial of the preliminary injunction. *Nelson v. NASA*, 506 F.3d 713 (9th Cir. 2007). The panel concluded that the information sought by SF 85 and its waiver requirement raised serious privacy issues and questioned whether it was narrowly tailored to meet the government's legitimate interest in ascertaining the identity of its low-risk employees. *Id.* at 716. The panel further found that "[t]he balance of hardships tips sharply in favor of [A]ppellants," who risk losing their jobs pending appeal, whereas there was no exigent reason for performing the NACI investigations during the few months pending appeal given that "it has been more than three years since the Presidential Directive [upon which the government relies] was issued." *Id.* at 716.

## II

To obtain preliminary injunctive relief, Appellants must demonstrate either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious

questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999). The two prongs are not separate tests but rather "extremes of a single continuum," so "the greater the relative hardship to [the party seeking the preliminary injunction], the less probability of success must be shown." *Id.* (internal quotation marks omitted).

Upon review of the merits of the district court's denial of preliminary injunctive relief, we find ourselves in agreement with the motions panel. Appellants have demonstrated serious questions as to certain of their claims on which they are likely to succeed on the merits, and the balance of hardships tips sharply in their favor. We therefore conclude that the district court abused its discretion in denying Appellants' motion for a preliminary injunction, and we reverse and remand.

## A.  *Standing and Ripeness*

The district court found that the justiciability doctrines of ripeness and standing precluded consideration of Appellants' claims, except as they concerned the SF 85 questionnaire and associated waiver. We agree with the district court that Appellants' claims concerning the suitability determination are unripe and unfit for judicial review; however, the district court misconstrued Appellants' informational privacy claim, viewing it as limited to the SF 85 questionnaire alone.

[1] To enforce Article III's limitation of federal jurisdiction to "cases and controversies," plaintiffs must demonstrate both standing and ripeness. To demonstrate standing, a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). The ripeness doctrine similarly serves "to prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies" and requires assessing " 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

**[2]** In analyzing justiciability, the district court distilled Appellants' claims into two basic arguments: (1) "that SF 85 is overly broad and intrusive considering the 'low-risk' nature of [appellants'] jobs at JPL" and (2) "that JPL's internal policy, which lists various grounds upon which an employee can be determined unsuitable for employment, is unconstitutional." We agree that challenges to the suitability determination are unripe because the record does not sufficiently establish how the government intends to determine "suitability"— accordingly, any claims are "strictly speculative." We also agree that Appellants have standing to challenge the SF 85 questionnaire, and because "it is undisputed that if [Appellants] do not sign the SF 85 waiver by October 5, 2007," they will "be deemed to have voluntarily resigned," there exists a "concrete injury that is imminent and not hypothetical" and thus ripe for review.

**[3]** However, the district court overlooked Appellants' challenges to the government *investigation* that will result from the SF 85 requirement that the applicant sign an "authorization for release of information." On its face, this waiver authorizes the government to collect "*any* information . . . from schools, residential management agents, employers, criminal justice agencies, retail business establishments, or other sources of information" "includ[ing], but . . . not limited to, . . . academic, residential, performance, attendance, disciplinary, employment history, and criminal history record information." It is uncontested that as a result of this authorization, the government Office of Personnel Management will send out "Investigative Request[s] for Personal Information," Form 42, to references, employers, and landlords. This form

seeks highly personal information using an open-ended questioning technique, including asking for "any adverse information" at all or any "additional information which . . . may have a bearing on this person's suitability for government employment." Any harm that results from Form 42's dissemination and the information consequently provided to the government will be concrete and immediate.

**[4]** Because Federal Appellees freely admit that Form 42 will be used in NASA's background investigations, Appellants have standing to challenge Form 42's distribution and solicitation of private information, and the issues raised in these challenges are ripe for review. The district court erred by excluding Form 42 claims from its analysis of Appellants' likelihood of success on the merits.

## B.  *APA Claims*

Appellants argue that Federal Appellees violated the APA by imposing background investigations on contract employees without any basis in executive order or statute. In response, Federal Appellees find authorization for their program in three statutory and regulatory sources: The Homeland Security Presidential Directive 12 ("HSPD 12"), the Federal Information Security Management Act ("FISMA"), and the Space Act.

**[5]** Both HSPD 12 and FISMA fail on their face to authorize the broad background investigations NASA has imposed on JPL personnel. HSPD 12 creates a Federal policy of "establishing a mandatory Government-wide standard for secure and reliable forms of identification issued by the Federal Government to its employees and contractors (including contractor employees)." However, many of the questions in SF 85 and Form 42 seek much more information than that which would securely and reliably identify the employees. *Nelson*, 506 F.3d at 716. Similarly, FISMA gives the Secretary of Commerce authority to "prescribe standards and guidelines

pertaining to Federal information systems," 40 U.S.C. § 11331(a)(1) (2002), but NASA's NACI requirement is hardly limited to protecting "Federal information systems." Indeed, the background investigations are required of all JPL personnel, whether or not they have access to information systems, and therefore cannot be entirely justified, if at all, by FISMA. That neither HSPD 12 nor FISMA authorize NASA's actions is reinforced by Federal Appellees' own declarations that "the decision to require at a minimum a NACI for NASA contractor employees dates back to the 2000 to 2001 timeframe," well before either FISMA was passed in 2002 or HSPD 12 was issued in 2004.

[6] The Space Act, at first glance, appears more promising; however, it too fails to justify requiring these open-ended investigations of "low-risk" contract employees. The Space Act authorizes the NASA Administrator to "establish such security requirements, restrictions, and safeguards as he deems necessary in the interest of the national security." 42 U.S.C. § 2455(a) (1958). The district court found that this language "clearly gives NASA the authority to implement background investigations as part of the security screening of contractors;" however, it ignored the statute's limiting language that the security programs established be "deem[ed] necessary in the interest of the national security." This phrase must be read in light of *Cole v. Young*, 351 U.S. 536 (1956), decided just two years before the Space Act was passed. In *Cole*, the Supreme Court considered a statute that gave certain government officials the power to summarily dismiss employees "when deemed necessary in the interest of the national security." *Id.* at 538 (internal quotation marks omitted). The Court noted:

> While that term is not defined in the Act, we think it clear from the statute as a whole that that term was intended to comprehend only those activities of the Government that are directly concerned with the protections of the Nation from internal subversion or

> foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare.

*Id.* at 544. The Court found it clear "that 'national security' was not used in the Act in an all-inclusive sense, but was intended to refer only to the protection of 'sensitive' activities. It follows that an employee can be dismissed 'in the interest of the national security' under the Act only if he occupies a 'sensitive' position . . . ." *Id.* at 551. We agree with Appellants that the use of identical limiting language in the Space Act so soon after *Cole* was decided strongly suggests that Congress expected the term "national security" to be similarly construed in this context. Therefore, the Space Act's authorization to establish "security requirements, restrictions, and safeguards" applies to "only those activities of the Government that are directly concerned with the protections of the Nation from internal subversion or foreign aggression," *id.* at 544, and background investigations can be deemed "in the interest of the national security" "only if [the target of the investigation] occupies a 'sensitive' position," *id.* at 551. Here, it is undisputed that the Appellants do not occupy "sensitive" positions; they are low-risk employees. Because the district court's reading of the Space Act failed to account for the Supreme Court's holding in *Cole*, its conclusion as to Appellants' likelihood of success as to their APA claim was erroneous.

## C. *Informational Privacy Claims*

[7] The district court similarly underestimated the likelihood that Appellants would succeed on their informational privacy claim. We have repeatedly acknowledged that the Constitution protects an "individual interest in avoiding disclosure of personal matters." *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). This interest covers a wide range of personal matters, including sexual activity, *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983) (holding that question-

ing police applicant about her prior sexual activity violated her right to informational privacy), medical information, *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality"), and financial matters, *Crawford*, 194 F.3d at 958 (agreeing that public disclosure of social security numbers may implicate the right to informational privacy in "an era of rampant identity theft"). If the government's actions compel disclosure of private information, it "has the burden of showing that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959 (internal quotation marks omitted).

**[8]** The district court correctly concluded that the requested information in this case is sufficiently private to implicate the right to informational privacy. SF 85 requires the applicant to disclose any illegal drug use within the past year, along with any treatment or counseling received. The Supreme Court has made clear, in the Fourth Amendment context, that individuals' reasonable expectations of privacy in their medical history includes information about drug use, *Skinner v. R.R. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989), and, by analogy, drug treatment or counseling. Moreover, Form 42 inquiries distributed as part of the NACI—omitted from the district court's analysis as a result of its erroneous ripeness holding—are even more probing. Form 42 solicits "any adverse information" concerning "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," and "other matters." These open-ended questions are designed to elicit a wide range of adverse, private information that "is not generally disclosed by individuals to the public," *Crawford*, 194 F.3d at 958; accordingly, they must be deemed to implicate the right to informational privacy.

**[9]** Considering the breadth of Form 42's questions, it is difficult to see how they could be narrowly tailored to meet

any legitimate need, much less the specific interests that Federal Appellees have offered to justify the new requirement. Asking for "*any* adverse information about this person's employment, residence, or activities" may solicit some information relevant to "identity," "national security," or "protecting federal information systems," but there are absolutely no safeguards in place to limit the disclosures to information relevant to these interests. Instead, the form invites the recipient to reveal *any* negative information of which he or she is aware. There is nothing "narrowly tailored" about such a broad inquisition.

**[10]** Finally, the context in which the written inquiries are posed further supports Appellants' claim. In *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983), we focused not only on the private nature of questions asked, but also on the lack of standards governing the inquiry. We held that questioning a female police applicant about her past sexual relations with another officer in the department violated her constitutional right to informational privacy, *id.* at 468, finding that many of the questions posed went beyond any relevant lines of questioning, *id.* at 469-70. More importantly, we noted that the city had not set any *standards* for inquiring about the private information. *Id.* at 470. "When the state's questions directly intrude on the core of a person's constitutionally protected privacy and associational interests . . . , an unbounded, standardless inquiry, even if founded upon a legitimate state interest, cannot withstand the heightened scrutiny with which we must view the state's action." *Id.* In this case, the government's questions stem from SF 85's extremely broad authorization, allowing it "to obtain *any* information" from any source, subject to other releases being necessary only in some vague and unspecified contexts. Federal Appellees have steadfastly refused to provide any standards narrowly tailoring the investigations to the legitimate interests they offer. Given that Form 42's open-ended and highly private questions are authorized by this broad, standardless waiver and do not appear narrowly tailored to any

legitimate government interest, the district court erred in finding that Appellants were unlikely to succeed on their informational privacy claim.

## D.  *Fourth Amendment Claims*

We agree with the district court's conclusion that Appellants are unlikely to succeed on their Fourth Amendment claims. The government's actions are not likely to be deemed "searches" within the meaning of the Fourth Amendment. An action to uncover information is considered a "search" if the target of the search has a "reasonable expectation of privacy" in the information being sought, meaning a "subjective expectation of privacy . . . that society is prepared to recognize as reasonable." *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1151 (9th Cir. 2007) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Under our Fourth Amendment jurisprudence, one does not have a reasonable expectation of privacy in one's information merely because that information is of a "private" nature; instead, such an otherwise reasonable expectation can evaporate in any of several ways. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 443 (1976) (holding that there is no reasonable expectation of privacy in bank records because the information was voluntarily disclosed to the bank).

**[11]** The Form 42 questionnaire sent to third parties cannot be considered a "search," because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities . . . ." *Miller*, 425 U.S. at 443. This principle has its roots in *Hoffa v. United States*, 385 U.S. 293 (1966), and *United States v. White*, 401 U.S. 745 (1971), both of which dealt with the government's use of confidential informants and held that the Fourth Amendment "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' " *White*, 401 U.S. at 749 (quoting *Hoffa*, 385 U.S. at 302). In *Miller*, the

Supreme Court held that the Fourth Amendment did not protect subpoenaed bank records, seemingly extending the *Hoffa/White* principle to cover all information knowingly disclosed to the government by a third party. Under *Miller*, therefore, written inquiries sent to third parties, no matter how private the subject of their questioning, cannot be considered "searches."

**[12]** Similarly, the questions posed directly to the applicant on the SF 85 questionnaire are also unlikely to be considered Fourth Amendment "searches," because that Amendment has not generally been applied to direct questioning. Instead, historically, when "the objective is to obtain testimonial rather than physical evidence, the relevant constitutional amendment is not the Fourth but the Fifth." *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587, 591 (7th Cir. 2005). As Judge Posner notes in *Greenawalt*, applying the Fourth Amendment to direct questioning would force the courts to analyze a wide range of novel contexts (e.g., courtroom testimony, police witness interviews, credit checks, and, as here, background checks) under a complex doctrine, with its cumbersome warrant and probable cause requirements and their myriad exceptions, that was designed with completely different circumstances in mind. *Id.* at 590-91. Moreover, declining to extend the Fourth Amendment to direct questioning will by no means leave individuals unprotected, as such contexts will remain governed by traditional Fifth and Sixth Amendment interrogation rights and the right to informational privacy described above. *See id.* at 591-92.

## E. *Balance of Hardships*

**[13]** The balance of hardships tips sharply toward Appellants, who face a stark choice—either violation of their constitutional rights or loss of their jobs. The district court erroneously concluded that Appellants will not suffer any irreparable harm because they could be retroactively compensated for any temporary denial of employment. It is true that

"monetary injury is not normally considered irreparable," *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980), and the JPL employees who choose to give up their jobs may later be made whole financially if the policy is struck down. However, in the meantime, there is a substantial risk that a number of employees will not be able to finance such a principled position and so will be coerced into submitting to the allegedly unconstitutional NACI investigation. Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Morever, the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages.

[14] On the other side of the balance, NASA has not demonstrated any specific harm that it will face if it is enjoined for the pendency of the adjudication from applying its broad investigatory scheme to "low risk" JPL contract employees, many of whom have worked at the laboratory for decades. As Caltech argues, JPL has successfully functioned without any background investigations since the first contract between NASA and JPL in 1958, so granting injunctive relief would make NASA no worse off than it has ever been. Moreover, an injunction in this case would not affect NASA's ability to investigate JPL personnel in "sensitive positions," significantly undercutting any lingering security fears. Finally, we note that NASA has taken years to implement NACI at JPL, a fact we construe as weakening any urgency in imposing the investigations before Appellants' claims are fully adjudicated on their merits.

## III

Caltech separately argues that any injunctive relief should not encompass it because, as a private actor, it cannot be held liable for constitutional violations that arise from the

government-imposed background investigations. Caltech is correct that there exists a "presumption that private conduct does not constitute government action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). This presumption is rebutted, however, when a sufficient nexus "make[s] it fair to attribute liability to the private entity as a governmental actor. Typically, the nexus consists of some *willful participation in a joint activity* by the private entity and the government." *Id.* at 843 (emphasis added).

**[13]** Caltech notes that it initially opposed the new background investigations, which are conducted entirely by NASA and other government agencies; therefore, it claims that the investigations are not "joint activities" and Caltech is not a "willful participant." We have some sympathy for this argument, and if Caltech had done nothing more than abide by the contract terms unilaterally imposed by NASA, we might agree with its position. Here, however, the record is clear that Caltech did do more—it established, on its own initiative, a policy that JPL employees who failed to obtain federal identification badges would not simply be denied access to JPL, they would be terminated entirely from Caltech's employment. This decision does not necessarily render Caltech liable as a governmental actor, but it raises serious questions as to whether the university has in fact now become a willful and joint participant in NASA's investigation program, even though it was not so initially. Caltech's threat to terminate non-compliant employees is central to the harm Appellants face and creates the coercive environment in which they must choose between their jobs or their constitutional rights. Moreover, with the government enjoined, Caltech faces no independent harm to itself, so the balance of hardships tips overwhelmingly in Appellants' favor. Therefore, we hold that preliminary injunctive relief should apply both to Caltech and to Federal Appellees.

## IV

Appellants have raised serious questions as to the merits of their informational privacy and APA claims, and the balance

of hardships tips sharply in their favor. The district court's denial of the preliminary injunction was based on errors of law and hence was an abuse of discretion. Accordingly, we reverse and remand with instructions to fashion preliminary injunctive relief consistent with this opinion.

**REVERSED and REMANDED.**