John WOODLAND, et al.,
Plaintiffs–Appellees,

v.

CITY OF HOUSTON,
Defendant–Appellant.

No. 90–2289.

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1991.

---

John E. Fisher and Robert J. Collins, Sr. Asst. City Attys., Clarence West, City Atty., Houston, Tex., for defendant-appellant.

Wayne W. Schmidt, Chicago, Ill., for amicus curiae Americans for Effective Law Enforcement.

James Harrington, Texas Civ. Rights Project, Austin, Tex., for plaintiffs-appellees.

Before REYNALDO G. GARZA, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PER CURIAM:

In this class action suit, Chris Goss, Ramdeo Jagassar, and John Woodland, named plaintiffs, challenge pre-employment polygraph tests given by the City of Houston's Police Department, Fire Department, and Airport Police Division. Specifically, they allege that the defendants violated their due process and equal protection rights under the federal constitution, their privacy rights under the federal and Texas constitutions and Texas common law, the Texas Polygraph Examiners Act, and the Texas Firemen's and Policemen's Civil Service Commission Act. The district court submitted the liability issues to a jury, and the jury found that the testing was unreasonably intrusive under both federal and state privacy standards but awarded no damages. The district court then imposed an injunction and awarded backpay. 731 F.Supp. 1304. Finding that the district court submitted questions of law to the jury, but failed to submit the relevant factual questions to the jury, we are compelled to vacate the relevant orders and remand the case to the district court for appropriate findings.

I

On April 15, 1982, Chris Goss, Ramdeo Jagassar, and John Woodland filed this suit against officials of the City of Houston, the Police Department, the Fire Department, and the Airport Police Division. They alleged that the defendants' pre-employment polygraph tests violated their due process and equal protection rights under the federal constitution, their privacy rights under the federal and Texas constitutions and Texas common law, the Texas Polygraph Examiners Act, and the Texas Firemen's and Policemen's Civil Service Commission Act. The court subsequently certified a class for the purposes of declaratory and injunctive relief, defined to include "[a]ll persons since April, 1980, who have been or may be denied employment by Defendants solely because of the results of polygraph examinations administered to them by Defendants or their agents."

Chris Goss received five polygraph tests pursuant to applications with the Fire Department and Airport Police Division. Goss initially applied to the Fire Department in 1975. He passed the required polygraph test and received a job offer, but the Fire Department later withdrew the offer because of a budget crunch. The Fire De-

partment contacted him again in 1977 and invited him to submit a second application. Goss reapplied but failed the required polygraph test. He was told that he had tested deceptive on questions related to theft and that he could take a second polygraph test at the Police Department. He agreed to the second test but again failed; this time he was told that he had tested deceptive on questions related to sexual behavior and drug use. Goss then asked the Fire Department if he could take another polygraph test with an independent examiner. The Fire Department refused his request but told him that he could take the polygraph test again if he waited one year.

Goss never reapplied to the Fire Department. However, in 1980, he submitted an application to the Airport Police Division. Like the Fire Department, the Airport Police Division required a polygraph test. Goss failed the test and was told that he had tested deceptive on a question inquiring into marijuana use within the last six months. He again objected and was told that he could take the polygraph test again if he waited one year. Goss submitted to a second polygraph test in 1981 and tested deceptive on questions inquiring into the date of his last polygraph test, marijuana use within the last six months, and narcotics use within the last year.

Goss testified at trial that he was asked very intrusive questions both during the pre-polygraph interviews and during the actual polygraph tests. According to Goss, he was asked about sexual behavior with animals, affairs with married women, girl-friends, cohabitation, extramarital affairs, homosexual behavior, masturbation, sexual activity as a teenager, sexual positions, thefts and criminal behavior as a minor, drug use, and details about his sexual relations with his wife. It is not clear from Goss' testimony whether these questions were asked during all five of the polygraph tests or only a few.

Stan Nadolski, presented by the defense, administered the first polygraph test for the Airport Police Division. He testified that Goss tested deceptive on three questions inquiring into marijuana use within the last six months, narcotics use within the last year, and the purchase or sale of illegal drugs at any time; Goss also admitted to using marijuana and sniffing glue in the past. Nadolski specifically denied asking Goss about affairs with married women (though he conceded asking about "cheating" generally), masturbation, extramarital affairs, sexual activity as a teenager, or the details about his sexual relations with his wife.

The defense also presented Thomas Wood, who administered the second polygraph test for the Airport Police Division. According to Wood, Goss tested deceptive on questions about his truthfulness on the polygraph test, marijuana use within the last six months, narcotics use within the last year, and homosexual behavior; Goss again admitted to using marijuana five times, last in 1977, and also to using quaaludes in 1975. Like Nadolski, Wood denied asking Goss about sexual behavior with animals, affairs with married women, masturbation, extramarital affairs, sexual activity as a teenager, or the details about his sexual relations with his wife.

Ramdeo Jagassar applied to the Police Department in 1981. He submitted to a required polygraph test pursuant to the application process. According to Jagassar, he was asked about extramarital affairs, the number of times that he had engaged in sexual behavior outside his marriage, the details about his sexual relations with a girlfriend, homosexual behavior, masturbation, sexual behavior with more than one person, sexual behavior with animals, venereal disease, religion, arrests of friends or family, and marijuana use. Jagassar was told that he had failed the test because of deceptiveness on questions related to "deviant sexual behavior."

Jagassar apparently reapplied to the Police Department in 1983. By then, however, he had already filed this suit against the Police Department. He was told that he was unqualified for the position because of the pending litigation.

The defense presented the testimony of Cathy Davis, the police officer who administered Jagassar's polygraph test. Al-

though the plaintiffs contend, in their brief, that Jagassar's "deviant sexual behavior" was living with another woman while separated from his wife, Davis testified that Jagassar had admitted during the polygraph test to homosexual behavior on five separate occasions. Davis readily conceded that she had asked Jagassar about extramarital affairs and stated that "[t]hat was a question that we ask all applicants." She also conceded that she had asked him about the number of times that he had engaged in sexual behavior outside his marriage, homosexual behavior, sexual behavior with animals, marijuana use at any time, arrests of family members, and religion, but denied questioning him about the details of his sexual relations with his wife or masturbation. Davis' own notes on the official polygraph test form confirm most of Jagassar's complaints.

John Woodland first applied to the Fire Department in 1980. During an initial interview, he admitted that he had smoked marijuana within the last two or three months. He was told that the Fire Department could not hire anyone who had used marijuana within the last six months and encouraged to wait a few months and then reapply. Woodland submitted a second application later the same year. This time he was asked extensive questions about drug use during the initial interview. After the initial interview, and a physical agility test, he submitted to the required polygraph test. According to Woodland, he was asked about indecency with children, homosexual behavior within the last two years, sexual behavior with animals, venereal disease, indecent exposure, membership in radical organizations, and drug use. He was told that he had tested deceptive on questions related to his truthfulness on the polygraph test, homosexual sexual behavior within the last two years, and marijuana use within the last six months. Woodland did not dispute, either during the test or at trial, that he used marijuana "less than 50 times" before applying to the Fire Department and that he had one (possibly forced) homosexual experience.

The defense offered the testimony of assistant fire chief Dennis Holder. Holder described the Fire Department's polygraph process as it existed in 1981 and testified generally that applicants were asked about drug use, criminal behavior, employment history, and "deviant" sexual behavior. On cross-examination, however, he conceded that during an earlier (and unspecified) period, applicants were asked questions related to the details of their sexual relations with their spouses. He could not remember when the Fire Department stopped asking questions about spousal relations, though he believed that the change had occurred sometime before 1981.

Over the defendants' objection, the district court granted the plaintiffs' jury demand. The defendants renewed their objection to the court's decision to submit the case to a jury at the start of the trial, arguing that the case presented only legal issues. The court overruled the objection without prejudice. In overruling the objection, the district judge implied that he intended to use the jury in an advisory capacity only. He explained to the defendants that "[w]hat I want to do is to get some useful information back from the jury so that the postjudgment application of the law can be as lawful as it can be." The parties stipulated that, if the jury found for the plaintiffs on the liability issue, they would then submit the backpay, injunction, attorneys fees, and costs issues to the court.

The district court submitted three liability questions to the jury. The first asked whether the defendants' use of polygraph tests was arbitrary; the jury found against the plaintiffs. The next two liability questions, relevant to this appeal, asked whether the questions used for the polygraph tests were unreasonably intrusive under federal and state standards.[1] The jury found for the plaintiffs on both of these liability questions but awarded no damages. The court had defined damages in the jury charge to include economic, physi-

---

1. The specific questions asked were as follows:
   *Question 2*
   Do you find that the questions asked by Houston were unreasonably intrusive?

The government may ask an applicant all questions that a reasonable employer could believe have a rational basis for discovering whether an applicant possesses the actual

cal, and professional losses, but not lost wages or benefits.

Although the court had implied that it would use the jury in an advisory capacity only, the district judge made no independent findings of fact as required by Fed.R. Civ.P. 52. Instead, in the final judgment, the court stated quite simply that the "liability questions were tried to a jury" and that the jury had found that the questions asked by Houston were unreasonably intrusive under both federal and state standards. The court itself awarded backpay to Goss, Jagassar, and Woodland, and imposed a permanent injunction precluding the defendants from asking certain questions in pre-employment polygraph tests. The defendants now appeal to this court, and we vacate the relevant orders and remand the case to the district court.

## II.

■ In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Supreme Court described the two strands of the right of privacy:

Most of the cases characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

Although the Court has provided little specific guidance for cases involving the confidentiality strand of privacy, our circuit has considered a number of confidentiality claims. The most significant decision is probably *Plante v. Gonzalez*, 575 F.2d 1119, 1134, 1137–38 (5th Cir.1978), where we adopted a balancing test, rather than the strict scrutiny employed in autonomy cases, and described the balancing of privacy interests and governmental interests as a question of law. *See also Nixon v. Administrator of General Services*, 433 U.S. 425, 439, 97 S.Ct. 2777, 2788, 53 L.Ed.2d 867 (1977) (affirming dismissal of a complaint for failure to state a claim after an "independent examination of the facts"); *Am. Civil Liberties Union v. State of Miss.*, 911 F.2d 1066 (5th Cir.1990); *Ramie v. City of Hedwig Village, Tex.*, 765 F.2d 490 (5th Cir.1985); *DuPlantier v. United States*, 606 F.2d 654 (5th Cir.1979).

■ The Supreme Court of Texas has only recently recognized a right of privacy in the Texas constitution. In *State Emp. Union v. Dept. of Mental Health*, 746 S.W.2d 203 (Tex.1987), the Court first declared that the Texas constitution implicitly recognizes a right of privacy and then, without distinguishing confidentiality and autonomy cases, adopted a strict scrutiny test in the context of a confidentiality claim. "The right to privacy should yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental objective that can be achieved by no less intrusive, more reasonable means." *Id.* at 205. We believe that Texas would also view the application of its strict scrutiny test as a question of law.

■ The district court clearly erred, then, in asking the jury to weigh the plaintiffs' privacy interests against the defendants' interests in pre-employment polygraph testing. The federal balancing, like the Texas strict scrutiny test, was a question of law for the court. Curiously, at

qualifications reasonably required for the particular job.

Consider (a) the serious governmental interest in the qualifications of its fire and police officers, (b) the legitimate authority for the government to choose freely among rational means to accomplish its proper functions, and (c) the importance in our system of individual liberty of a person's being secure in his private life from governmental prying.

*Question 4*

Do you find under the Texas standard that the questions asked by Houston were unreasonably intrusive?

An applicant for public employment as a fire fighter of police officer can be denied employment as a result of polygraph examinations if all of these conditions are met:

(a) No questions are asked which intrude into the applicant's private life beyond matters reasonably related to the actual requirements for the job the applicant seeks; and

(b) The questions asked during the polygraph examination ar narrowly, specifically, and directly related to the applicant's potential for capable performance of the job; and

(c) The government has no other reasonable alternative method to acquire the information it needs.

the same time, the district court did not submit the relevant factual questions to the jury. Specifically, the evidence was conflicting as to what questions were asked during the plaintiffs' polygraph tests. The jury's general findings that the questions were intrusive could mean that the jury believed the plaintiffs' versions of the events in question. On the other hand, the jury could have believed the versions urged by the defense but still found the questions intrusive.

The jury's findings also say little about the pervasiveness of abuses. In the absence of findings that abuses were both continuing and affecting the class as a whole, class relief in the form of an injunction was inappropriate. We are particularly concerned with the fact that, in 1983, the Fire Department and Airport Police Division signed contracts with professional polygraph companies to provide for pre-employment polygraph testing of their applicants by the companies. The contracts require the companies to use attached questionnaires, and the questions specified on the questionnaires are significantly less intrusive than the questions described by the named plaintiffs at trial. All of the evidence at trial related to polygraph tests given, at the latest, in 1981.

Although the defendants do not raise these issues on appeal, we are compelled to remand the case to the district court because the absence of factual findings frustrates appellate review. Factual questions are a matter for the district court. We cannot resolve such questions on appeal, nor can we address the legal questions raised by the appeal without clear resolution of the factual issues. We therefore remand to the district court for the appropriate findings. Because the plaintiffs admittedly failed to comply with the requirements of Fed.R.Civ.P. 38, and because the defendants never made a jury demand, we leave to the district court whether the relevant factual questions should be retried to a new jury or determined by the court. *See* Fed.R.Civ.P. 39(b).

In sum, on remand the district court should first resolve the subsidiary factual questions, such as what questions were asked during the named plaintiffs' poly-graph tests and, if there were abuses of privacy, did the abuses cause injury to the named plaintiffs, and were they pervasive. These questions can be resolved either by a jury or by the court in accordance with Fed.R.Civ.P. 52. The court should then itself balance the relevant privacy and governmental interests as a matter of law. Finally, if the court finds a violation of the named plaintiffs' privacy rights, the court should separately determine whether the evidence also supports class relief in the form of an injunction.

The judgment of the district court is VACATED and the case REMANDED.