**CITY OF SHERMAN, Appellant,**

v.

**Otis HENRY, Appellee.**

No. 05–94–00055–CV.

Court of Appeals of Texas, Dallas.

Aug. 28, 1995.

Ronald H. Clark, Wolfe Clark Henderson & Tidwell, L.L.P., Sherman, for appellant.

Robert E. Richardson, Jr., Richardson Law Office, Sherman, for appellee.

Before THOMAS, C.J., and MALONEY and CHAPMAN, JJ.

## OPINION ON MOTION FOR REHEARING

THOMAS, Chief Justice.

Appellant's motion for rehearing is granted. We withdraw our opinion of May 25, 1995, and substitute the following opinion in its place. We also vacate our previous judgment.

In this case, we must decide whether a public employee's private, legal sexual conduct is protected under the Texas Constitution. Further, if such a constitutional right

of privacy exists, we must decide whether the City of Sherman (the City) established that it had a compelling governmental interest that could be achieved by no less intrusive, more reasonable means.

The City's police chief refused to promote appellee, Otis Henry, to the rank of sergeant based solely on appellee's off-duty, private, legal sexual conduct. The Sherman Civil Service Commission (the Commission) upheld the police chief's decision. Appellee sought judicial review of the Commission's decision in the district court. The trial court found the police chief's actions violated appellee's right of privacy under the United States and Texas Constitutions. Because it held appellee's private conduct was constitutionally protected, the trial court concluded that such conduct did not constitute a "valid reason" for denying the promotion. See TEX.LOCAL GOV'T CODE ANN. § 143.036(f) (Vernon Supp. 1995). Accordingly, the trial court rendered summary judgment in appellee's favor. In four points of error, the City generally argues the trial court erred in: (i) granting appellee's motion for summary judgment; (ii) denying its motion for summary judgment; (iii) awarding attorney's fees to appellee; and (iv) denying its attorney's fees.

We affirm the trial court's judgment as it relates to the constitutional issues because appellee's conduct is protected by the Texas Constitution, and the City did not prove that it had a compelling governmental interest that could be achieved by no less intrusive, more reasonable means. We reverse the trial court's judgment as it relates to attorney's fees and remand for a trial on the issue of attorney's fees.

## FACTUAL BACKGROUND

### 1. The Secret Marriage

Kelly Olson and Tom Pollard were both employed by the Sherman Police Department. Olson worked as a dispatcher and Pollard served as a sergeant in the patrol division. Olson and Pollard were married on September 30, 1989; however, the couple kept their marriage a secret for nearly two years because the police department had a

nepotism policy prohibiting marriage between employees.[1]

In April 1991, appellee, a Sherman police officer, began dating Olson. Because appellee knew Olson and Pollard were living together, he asked Olson if they were married. Olson at first assured appellee that she was not married. However, three months later Olson told appellee that she and Pollard were, in fact, married. Shortly after Olson told appellee she was married, Olson and Pollard filed a statement with the City acknowledging their marriage.

Appellee responded to the announcement by writing a letter to Olson. In the letter, appellee told Olson, "I'm going to give you room, to stay out of your life, and try not to pressure you." The record, however, does not clearly indicate how long appellee stayed away from Olson. After receiving appellee's letter, Olson and Pollard attempted a reconciliation. Within a month, however, the two separated and filed for divorce. Following the attempted reconciliation, Olson and appellee resumed dating.

### 2. The Sergeant's Position

Rumors of the Olson-appellee relationship began to circulate in the police department eight months after the relationship began, when a sergeant's position became available. At that time, the City's director of personnel/civil service sent a list to the police chief naming the top three candidates on the current civil-service list who were eligible for promotion to sergeant. Appellee was ranked first on the list.

Appellee's score from the civil-service exam plus his seniority points totaled ninety. The next two candidates on the list each had total scores of eighty-six. Additionally, appellee had completed all Texas Commission on Law Enforcement certification procedures, earned a bachelor's degree in criminal justice, and received numerous commendations. In fact, appellee was honored as "Outstanding Officer of the Year" in 1991.

After the sergeant's vacancy was posted and the civil-service list received, the police chief asked a lieutenant to informally investigate the rumors regarding the Olson-appellee relationship. Although it is unclear from the record who actually led the investigation, it resulted in a report prepared solely by Pollard while his divorce from Olson was pending. The report concluded appellee had been involved in an affair with Olson. This conclusion was based in part on copies of private correspondence between appellee and Olson that Pollard found hidden in Olson's closet. The private correspondence was attached to Pollard's report.

A few days later, a computer-generated sign was posted on a bulletin board in the police department and placed in most officers' mailboxes. The sign stated: "If you can't trust another officer with your wife, how can you trust him with your life?" At about the same time, appellee went to the police chief because he had heard rumors the chief was considering passing him over for the promotion. At the meeting, the police chief confronted appellee about the rumors concerning the relationship with Olson. Appellee did not deny the truth of the rumors.

A month after receiving Pollard's report, the police chief ultimately refused appellee's promotion. The police chief explained his decision was based entirely on appellee's relationship with Olson. In his written explanation, the chief stated he believed (i) appellee would not command respect and trust from rank and file officers or other members of the department, and (ii) appellee's promotion would adversely affect the efficiency and morale of the department.

### 3. The Record Presented to the Commission

Appellee appealed the police chief's decision to the Commission. At the Commission hearing, the City called four witnesses to show it had a valid reason for refusing to promote appellee.

At the hearing, the police chief testified he did not promote appellee because of his rela-

---

1. While the record is unclear on this point, it appears the department's nepotism policy pro-

hibited marriage but not cohabitation.

tionship with Olson and the impact it would have on appellee's ability to perform his duties. However, the police chief never specifically stated *how* appellee's ability to perform his duties was affected. Instead, he focused on the effect that knowledge of the relationship had on the department. The police chief acknowledged that appellee was very qualified for the sergeant's position. He admitted, however, that he did not consider any of appellee's qualifications because he was "blinded" by the Olson-appellee relationship. In making his decision, the police chief relied on Pollard's report and the private correspondence to conclude that the relationship existed. The chief admitted that he had no reason to suspect that any sexual activity took place while appellee was on duty. When describing the impact the relationship had on the department, the chief pointed to the following facts: (i) Pollard took some sick leave and seemed distraught; (ii) there were rumors among the officers about this relationship; and (iii) the sign posted on the bulletin board. The chief concluded that other than the sign, a few rumors, and innuendo, he had no first-hand knowledge of dissension within the department.

The police chief had never before passed over a candidate for promotion. In explaining his decision in this matter, the police chief acknowledged there was no written rule in the department's manual or in state law authorizing him to deny appellee the promotion. Rather, the police chief stated he had an unwritten policy that he would not promote anyone having an affair with the spouse of a fellow officer. Elaborating on this unwritten rule, the chief said he would also refuse to promote anyone having a relationship with the girlfriend or boyfriend of a fellow officer. However, when the chief was asked if he would promote Pollard to lieutenant if Pollard were known to have had an affair with a fellow officer's wife, the chief responded that he could not say because he would have to consider each incident on a case-by-case basis. In appellee's case, however, the chief categorically stated that he was blinded by appellee's relationship with Olson and was unable to even consider any of appellee's numerous qualifications.

Sergeant Blankenship, appellee's immediate supervisor, testified that this situation had adversely affected his shift because officers were spending time talking about the propriety of the relationship. However, Blankenship also noted that there was still "good order and discipline" on his shift. Blankenship also acknowledged he had evaluated appellee twice after the affair began, and he had not rated any aspect of appellee's performance as unsatisfactory in either evaluation. While Blankenship noted in the evaluations that appellee was the next officer on the promotion list, he made no notations indicating whether appellee should or should not be promoted.

Dwayne Barber, a criminal justice instructor at Grayson County College, testified as an expert witness. He said that, in general, promoting an officer who had an affair with another officer's wife would have an adverse impact on the police department. In particular, Barber believed that other officers might have difficulty trusting such an officer. He admitted, however, that his opinion might change if the officer did not know the woman was married when the affair began. Barber further testified that although this relationship had been common knowledge for at least three months at the time of the Commission hearing, he had observed no morale problems in the police department.

Barber's perception was corroborated by Captain Caylor, a twenty-one-year veteran of the police department. Caylor testified the department's morale had not been affected. He further testified he was not concerned by the fact the sign was posted on the bulletin board because officers frequently post signs making fun of fellow officers.

Appellee called two witnesses on his behalf, Olson and himself. Olson explained that she and Pollard did not inform the City they were married until July 1991 because they both wanted to continue working for the department. Olson also testified that by the time she told appellee in June 1991 that she was married, their relationship had become serious. In fact, she said that by the time she told him she was married, appellee had

sent her several letters telling her he had fallen in love with her.

Appellee testified he had fallen in love with Olson by the time she told him she was married. He also testified that he still loved Olson and that they were again seeing each other. Appellee further stated that he had not experienced any conflicts on the job, even after the sign was posted on the bulletin board.

## PROCEDURAL POSTURE

■ After the Commission decided the police chief had a valid reason for not promoting appellee, appellee appealed to the district court. Appeals to the district court from civil-service-commission decisions are authorized by the local government code. Tex.Local Gov't Code Ann. § 143.015 (Vernon 1988). In the district court, appellee did not challenge the Commission's fact findings. Rather, he alleged the basis for the police chief's decision not to promote him was unconstitutional. The application of strict scrutiny when reviewing whether the government has violated a citizen's constitutional rights is a matter of law. *See Woodland v. City of Houston,* 940 F.2d 134, 138 (5th Cir.1991). Consequently, the trial court held that as a matter of law the City had violated appellee's constitutional rights. The City appealed to this Court challenging the district court's ruling on this matter of law.

■ The City argues we should review this question of law under the substantial evidence rule. We disagree. When reviewing administrative agency decisions, questions of law are not entitled to a presumption of validity. *See Texas Workers' Compensation Ins. Facility v. State Bd. of Ins.,* 894 S.W.2d 49, 52 (Tex.App.—Austin 1995, no writ). Neither a district court nor an appellate court is bound by an administrative agency's interpretation of the law. *See Sonic Drive–In v. Hernandez,* 797 S.W.2d 254, 257 (Tex.App.—Corpus Christi 1990, writ denied). In fact, the only time courts should give serious consideration to an agency's legal interpretation is when the agency is construing the statute that it is charged to enforce. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). Thus,

whether the City's action violated the United States or Texas Constitution is not reviewed under the substantial evidence rule. *See, e.g., Firemen's & Policemen's Civil Serv. Comm'n v. Hamman,* 404 S.W.2d 308, 312 (Tex.1966) (analyzing whether an administrative proceeding denied a party procedural due process).

■ Further, this constitutional issue was not before the Commission. In seeking judicial review of the Commission's ruling, appellee alleged for the first time that the City relied on unconstitutional grounds when it decided not to promote him. Parties seeking to challenge civil-service-commission decisions on constitutional grounds may first do so in the trial court. *See Turner v. City of Carrollton Civil Serv. Comm'n,* 884 S.W.2d 889, 894 (Tex.App.—Amarillo 1994, no writ); *Paz v. City of Houston,* 748 F.Supp. 480, 484 (S.D.Tex.1990). Because we do not defer to an agency's determination of a matter of law and because the constitutional issue was not heard by the Commission, it would be improper for us to defer to the Commission by reviewing this constitutional question under the substantial evidence standard. Thus, we will review the constitutional question de novo and in accordance with the traditional standard of review for summary judgments.

## SUMMARY JUDGMENT

In the first two points of error, the City contends the trial court erred in (i) granting appellee's motion for summary judgment and (ii) denying its motion for summary judgment.

### 1. Standard of Review

■ The function of summary judgment is not to deprive a litigant of the right to a full hearing on the merits of any real issue of fact but to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (Tex.1952). In reviewing a summary-judgment record, this Court applies the following standards:

1. The movant for summary judgment has the burden of showing that there is no

genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in his favor.

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

When two parties file motions for summary judgment and one is denied and the other granted, we may review the denial and render judgment if the appealing party complains of both the granting of the opponent's motion and the denial of its own. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988). Further, when the parties do not dispute the facts, we review all legal questions presented. *Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex.1993). When crossmotions for summary judgment deal solely with the interpretation of federal and state constitutions, the sole issue before the court is a matter of law. We determine de novo whether a party's right to prevail is established as a matter of law. *Elam v. Yale Clinic*, 783 S.W.2d 638, 641 (Tex.App.—Houston [14th Dist.] 1989, no writ).

The City moved for summary judgment claiming as a matter of law its reason for not promoting appellee was valid. The City admitted there were no disputed facts and included among its summary-judgment proof the statement of facts from the Commission hearing. Appellee also moved for summary judgment and agreed the facts were undisputed. Moreover, appellee adopted by reference the City's summary-judgment proof as his own. Thus, on crossmotions for summary judgment, the trial court was presented solely with two questions of law: (i) Was appellee's conduct protected by the United States or Texas Constitution; and (ii) Did the City have a compelling governmental interest that could be achieved by no less intrusive, more reasonable means?

## 2. The Burdens of Proof

Under the Texas Constitution, appellee bears the burden of proving that his conduct implicates the protection of the Texas right of privacy. *See Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987) (*TSEU* ). If the Texas right of privacy is implicated, the City may still prevail if it can conclusively establish it has a compelling governmental interest that can be achieved by no less intrusive, more reasonable means. *TSEU*, 746 S.W.2d at 205. Thus, the City is in a position analogous to having an affirmative defense. As a movant for summary judgment who asserts the facts are undisputed, the City must conclusively establish each essential element of its affirmative defense or negate an element of appellee's claim to be entitled to summary judgment. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657 (Tex.App.—Dallas 1992, no writ).

A defendant asserting an affirmative defense may be able to avoid the plaintiff's summary judgment by asserting that fact issues exist regarding its affirmative defense. In this case, the City did not make that argument. In fact, the City explicitly claimed the facts were undisputed and it was entitled to judgment as a matter of law. Motions for summary judgment must stand or fall on the grounds specifically set forth in the motions. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339 (Tex.1993). Further, on appeal the City claims only that the trial court erred in granting appellee's motion for summary judgment and in denying the City's motion for summary judgment. Significantly, the City does not raise a point of error alleging the existence of fact issues. We do not reverse a trial court's judgment on the basis of unassigned error. *American Gen. Fire & Casualty Co. v. Weinberg*, 639 S.W.2d 688, 689 (Tex.1982); *Nationwide Property & Casualty Ins. Co. v. McFarland*, 887 S.W.2d 487, 496 (Tex.App.—Dallas 1994, writ denied).

## 3. The Constitutional Challenge

In his motion for summary judgment, appellee argued that the police chief's reason for passing him over was constitutionally infirm and therefore was not a "valid

reason" for failing to promote him. *See* Tex.Local Gov't Code Ann. § 143.036(f) (Vernon Supp.1995).[2] Thus, we must determine whether the state or federal constitution's right of privacy is implicated when a public employer fails to promote an employee based on the employee's off-duty, private, sexual conduct. When, as here, violations of both the state and federal constitutions are alleged, we look first to the Texas Constitution, basing our decisions on it whenever possible. *Ex parte Tucci,* 859 S.W.2d 1, 5 (Tex.1993); *Davenport v. Garcia,* 834 S.W.2d 4, 17 (Tex.1992). If the challenged action violates our state constitution, consideration of any federal claim is unnecessary. *Davenport,* 834 S.W.2d at 11.

The Texas Supreme Court has addressed the need for a fully developed record when determining constitutional questions on summary judgment. *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 715 (Tex.1990) (orig. proceeding). In *Brady,* the court noted:

> Application of a constitutional balancing test is particularly dependent on a fully-developed factual record. . . . [R]esolving the constitutional issue necessarily requires factual determinations. It is perhaps possible that the evidence to support the various balancing test factors could be stipulated or otherwise be undisputed and presented in a form that would allow meaningful constitutional analysis. We need not decide that question because it clearly is not presented in this case. Here [the parties] explicitly maintained that the

facts were disputed and asserted their rights to develop fully the factual record. *Brady,* 795 S.W.2d at 715.

In this case, the parties had a chance to fully develop the factual record in the hearing before the Commission and both parties have incorporated the statement of facts from that hearing into their summary-judgment evidence. Further, both parties agree that all material facts are undisputed. Thus, we conclude it was proper for the district court to decide these questions of constitutional law on summary judgment.

## A. The Texas Constitution

 The Texas Constitution accords individuals greater safeguards for their personal freedom than does its federal counterpart. *See LeCroy v. Hanlon,* 713 S.W.2d 335, 339 (Tex.1986) (holding the Texas Constitution has independent vitality).[3] To allow the federal courts' interpretation of the federal constitution to dictate, as a matter of course, the precise boundaries of our state constitutional guarantees is at odds with the fundamental tenets of our dual system of constitutional adjudication. Under our system of federalism, it is the states' responsibility to interpret and apply their state constitutions independently. *See LeCroy,* 713 S.W.2d at 338–39. To do otherwise would deprive Texas citizens of a critical source of protection for their rights and render moot our state constitution.

 In several areas, Texas courts have relied on the state constitution to find more expansive rights than those granted by the federal constitution. *See, e.g., In re J.W.T.,*

---

2. Section 143.036(f) of the local government code provides:

 Unless the department head has a valid reason for not appointing the person, the department head shall appoint the eligible promotional candidate having the highest grade on the eligibility list. If the department head has a valid reason for not appointing the eligible promotional candidate having the highest grade, the department head shall personally discuss the reason with the person being bypassed before appointing another person. The department head shall also file the reason in writing with the commission. On the application of the bypassed eligible promotional candidate,

the reason the department head did not appoint that person is subject to review by the commission.

3. The Texas Court of Criminal Appeals has also held that the Texas Constitution may provide greater protection than the United States Constitution. *See Autran v. State,* 887 S.W.2d 31, 42 (Tex.Crim.App.1994) (holding article one, section nine of the Texas Constitution may provide greater protection than the Fourth Amendment); *Heitman v. State,* 815 S.W.2d 681, 690 (Tex.Crim.App.1991) (holding Texas courts analyzing search and seizure under the state constitution are not bound by United States Supreme Court precedent analyzing the Fourth Amendment).

872 S.W.2d 189, 197 & n. 23 (Tex.1994) (stating the Texas due course of law guarantee has independent vitality from the due-process clause of the Fourteenth Amendment); *Ex parte Tucci*, 859 S.W.2d at 5 (stating that the Texas Constitution provides greater rights of free expression than does the federal constitution); *Davenport*, 834 S.W.2d at 8 (recognizing some aspects of the Texas free speech provision are broader than the First Amendment); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 397 (Tex.1989) (holding that the state educational finance system violates the state constitution, although the United States Supreme Court had found no violation of the United States Constitution); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 944 (Tex.1988) (Gonzalez, J., concurring) (stating that the rights of free speech and free press are more extensive under the state constitution than under the federal constitution); *LeCroy*, 713 S.W.2d at 338–40 (holding that the Texas Constitution's open-courts provision provides rights separate and distinct from traditional guarantees of due process). Because the Texas Constitution provides greater safeguards to personal freedom than its federal counterpart, we must enforce the provisions of the state constitution even if the federal courts have given a different interpretation to a similar provision of the federal constitution.

## B. The Texas Right of Privacy

Our analysis of the Texas right of privacy is controlled by *TSEU*, 746 S.W.2d at 204–06. The *TSEU* court recognized that the Texas Bill of Rights guarantees the right of privacy. *TSEU*, 746 S.W.2d at 205. In addressing the right of privacy, the *TSEU* court broadly held:

> [T]he Texas Constitution protects personal privacy from unreasonable intrusion. This right to privacy should yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental

objective that can be achieved by no less intrusive, more reasonable means.

*TSEU*, 746 S.W.2d at 205.

■ Although the supreme court recognized the right of privacy in *TSEU*, it did not clarify the full scope of this right. Nonetheless, this right is an essential freedom retained by the citizens of Texas. As Justice Hightower has noted, Texans should "resist any attempts to trivialize or otherwise weaken this fundamental right. It is imperative that the right to privacy under the Texas Constitution remain a vital right for the protection of all Texans." *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 203 (Tex.1992) (Hightower, J., concurring).

■ Since *TSEU*, the supreme court has not elaborated on the extent of the Texas right of privacy in matters of sexual conduct. However, two lower-court cases have addressed the extent of this right in the context of sexual conduct. *City of Dallas v. England*, 846 S.W.2d 957, 959 (Tex.App.—Austin 1993, writ dism'd w.o.j.) (holding the Texas sodomy statute unconstitutional); *State v. Morales*, 826 S.W.2d 201, 204–05 (Tex.App.—Austin 1992) (holding the Texas sodomy statute unconstitutional), *rev'd on other grounds*, 869 S.W.2d 941 (Tex.1994). Both of these cases recognize that the Texas right of privacy protects sexual behavior between consenting adults in private. *England*, 846 S.W.2d at 959; *Morales*, 826 S.W.2d at 204–05. Neither of these cases, however, addresses the precise issues with which we are presently confronted. Notably, in our case, we are not presented with: (i) a challenge to a statute; (ii) any allegation that appellee's relationship violated any criminal laws;[4] or (iii) a challenge to a written policy of the police department. Instead, this case presents the question whether a public employee's private, legal sexual conduct is protected under the Texas Constitution. Based on the supreme court's analysis in *TSEU*, we hold that appellee's conduct is protected by the Texas Constitution.

---

4. In fact, the Texas Legislature repealed the statutes outlawing fornication and adultery in 1973. Tex.Penal Code Ann. art. 503 (Vernon 1925), *repealed by* Act of June 14, 1973, 63d Leg., R.S., ch. 399, § 3, 1973 Tex.Gen.Laws 883, 992 (forni-

cation); Tex.Penal Code Ann. art. 499 (Vernon 1925), *repealed by* Act of June 14, 1973, 63d Leg., R.S., ch. 399, § 3, 1973 Tex.Gen.Laws 883, 992 (adultery).

While federal case law does not control our interpretation of our own constitution, we find two cases from the Ninth Circuit persuasive. *See Fleisher v. City of Signal Hill*, 829 F.2d 1491 (9th Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988); *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983), *cert. denied*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). Both cases address the extent of the federal right of privacy in situations involving facts similar to those presented in this case. *Fleisher*, 829 F.2d at 1497–99; *Thorne*, 726 F.2d at 468–71.

In *Thorne*, Deborah Thorne, a female applicant for a position with a police department, was not hired because she previously had a relationship with an officer still on the police force. *Thorne*, 726 F.2d at 462. Thorne received the second highest score on the written and oral tests, and she was listed as an eligible applicant for the position. *Thorne*, 726 F.2d at 462. She also successfully completed a physical agility test and a psychological screening. *Thorne*, 726 F.2d at 462.

During her required polygraph exam, Thorne was asked detailed questions about a miscarriage she had suffered. *Thorne*, 726 F.2d at 462. One of these questions asked who the father of the child was. *Thorne*, 726 F.2d at 462. Thorne reluctantly acknowledged that the father was a married officer still on the force. *Thorne*, 726 F.2d at 462. Contrary to the results of earlier psychological and physical exams, the polygraph examiner concluded that Thorne lacked sufficient aggressiveness, self-assuredness, or probable physical ability to handle herself in stressful situations. *Thorne*, 726 F.2d at 462. Based on this conclusion, the department refused to hire Thorne. Thorne sued the police department, claiming in part that the handling of the polygraph examination and its results by the individual defendants invaded her constitutionally protected right of privacy. *Thorne*, 726 F.2d at 468.

In analyzing Thorne's claim of constitutional violations, the Ninth Circuit explained the federal constitution protects two kinds of privacy interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions. The court concluded that "[t]he interests Thorne raises in the privacy of her sexual activities are within the zone protected by the constitution." *Thorne*, 726 F.2d at 468.

The Ninth Circuit revisited this issue four years later in *Fleisher*. While reaffirming its decision in *Thorne*, the court in *Fleisher* elaborated on its analysis of the right of privacy and took efforts to differentiate the facts in *Fleisher* from those in *Thorne*. *Fleisher*, 829 F.2d at 1497–98. In *Fleisher*, Signal Hill hired Gerry Fleisher as a probationary police officer in February 1983. *Fleisher*, 829 F.2d at 1493. In June 1983, a woman filed a forcible rape charge against another officer in the department. During the investigation of the charge, the woman acknowledged that she had had sexual relations with Fleisher several years previously while she was still a minor. *Fleisher*, 829 F.2d at 1493. At the time of the sexual relationship with Fleisher, the woman was fifteen years old and Fleisher was nineteen. *Fleisher*, 829 F.2d at 1492–93. Both were members of a Boy Scouts of America Explorer post sponsored by the police department. *Fleisher*, 829 F.2d at 1492. Following an investigation of Fleisher's conduct, he was terminated. *Fleisher*, 829 F.2d at 1493. As reasons for the firing, the police chief cited three previous reprimands for misconduct during Fleisher's probationary period and his previous sexual conduct with a minor. *Fleisher*, 829 F.2d at 1493. Fleisher appealed the termination, complaining the police department had, among other things, violated his right of privacy. *Fleisher*, 829 F.2d at 1493.

Focusing on Fleisher's right of privacy claim, the court noted that while the Supreme Court has not defined the outer limits of the right of privacy, it has extended the right to cases involving personal decisions about marriage, procreation, contraception, family relationships, child rearing and education, and abortion. *Fleisher*, 829 F.2d at 1497 (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977)). The court then fo-

cused its attention on the line of Supreme Court cases based on individual autonomy where the right of privacy has been extended to unmarried individuals. *Fleisher*, 829 F.2d at 1497 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972)). While focusing on the extent of the right of privacy, the court also noted that the Supreme Court has expressly stated that the federal right of privacy does not protect all private sexual conduct. *Fleisher*, 829 F.2d at 1497 (citing *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (failing to find a general right of sexual privacy regarding homosexual conduct in a case questioning the constitutionality of a Georgia statute outlawing heterosexual and homosexual sodomy)).[5]

In analyzing the extent of the federal right of privacy, the *Fleisher* court focused on four factors: (i) the legality/illegality of the conduct; (ii) when the conduct occurred; (iii) the effect on the police department's community reputation and internal morale; and (iv) whether the conduct was clearly listed in the department's regulations as grounds for punishment. *Fleisher*, 829 F.2d at 1498–99. Considering these factors, the court first stated that the illegality of Fleisher's behavior created a substantial barrier to his successful assertion of a privacy claim. *Fleisher*, 829 F.2d at 1498. Second, the court noted that even though the conduct took place before Fleisher was employed by the department, the department had an understandable concern that individuals hired to be guardians of the law should themselves have a history of compliance with the law. *Fleisher*, 829 F.2d at 1499. Third, the court believed that hiring an officer who had committed statutory rape with a member of the department's Explorer post would damage the reputation of the Explorer program and the department itself. *Fleisher*, 829 F.2d at 1499. The court also believed that retaining Fleisher would adversely affect the morale of other officers. Fourth, the court noted that Fleisher's conduct was clearly listed in the department's regulations as grounds for termination. *Fleisher*, 829 F.2d at 1499. Consequently, the court concluded that Fleisher's conduct was not protected by the federal right of privacy. *Fleisher*, 829 F.2d at 1499.

Applying the *Fleisher* factors to our case, we first note that appellee's conduct, unlike Officer Fleisher's, was legal. Second, there are no allegations that Olson and appellee ever engaged in sexual activity while on duty. Third, and of particular importance, we note all the witnesses with personal knowledge of the police department testified that the department's morale and discipline had not suffered in the three months after the relationship became common knowledge. Fourth, glaringly absent in this case are any written

---

5. Most of the federal cases involving the federal right of privacy with facts similar to the case currently before us were decided prior to *Bowers v. Hardwick*. The results of those cases are mixed. *See Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir.1984) (holding that a police officer's dating a daughter of an organized crime figure was protected by the First Amendment's freedom of association clause); *Briggs v. North Muskegon Police Dep't*, 563 F.Supp. 585, 590 (W.D.Mich.1983) (holding that the discharge of a police officer because he was cohabitating with a woman to whom he was not married violated the officer's right of privacy), *aff'd*, 746 F.2d 1475 (6th Cir.1984), *cert. denied*, 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985); *Swope v. Bratton*, 541 F.Supp. 99, 108 (W.D.Ark.1982) (recognizing that a police officer's private off-duty sexual activities are within the zone of privacy and are protected from unwarranted governmental intrusion); *Shuman v. City of Philadelphia*, 470 F.Supp. 449, 459 (E.D.Pa.1979) (holding that regulations permitting inquiry into off-duty relationships of police officers exceeded the scope of the state's legitimate interests and violated the officer's constitutional right of privacy). *But see Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir.) (holding that an officer's right to privacy was not infringed by a regulation prohibiting cohabitation of two police officers or proscribing superior officer from cohabitating with officer of lower rank), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983); *Suddarth v. Slane*, 539 F.Supp. 612, 618 (W.D.Va.1982) (holding that a state trooper's adulterous relationship is protected neither by the First nor Fourteenth Amendments, especially when the Commonwealth of Virginia has a law which prohibits adultery); *Wilson v. Swing*, 463 F.Supp. 555, 562–64 (M.D.N.C.1978) (holding that a police officer's adulterous relationship was not protected by the constitutional right of association or the analogous right of privacy). Reviewing these cases in our analysis of the Texas Constitution's right of privacy, we conclude the cases recognizing a right of sexual privacy present the stronger argument.

regulations or guidelines prohibiting the complained-of conduct.

Several states have also addressed the extent of the right of privacy in cases involving police officers' private sexual conduct. The Pennsylvania Supreme Court addressed this issue in *Fabio v. Civil Serv. Comm'n*, 489 Pa. 309, 414 A.2d 82 (1980).[6] Officer Fabio and his wife were having marital difficulties. Officer Fabio believed that these difficulties could be overcome if his wife would engage in a sexual relationship with another officer on the police force. Meanwhile, Officer Fabio started an affair with his wife's eighteen-year-old sister. *Fabio*, 414 A.2d at 84. Based on this conduct, the Philadelphia Civil Service Commission recommended that the police department dismiss Officer Fabio. *Fabio*, 414 A.2d at 84. Officer Fabio challenged his dismissal asserting, among other things, that his conduct was protected by the right of privacy. *Fabio*, 414 A.2d at 87. In addressing the right of privacy, the court concluded that individuals in Pennsylvania have the right to engage in extramarital sexual activities free from governmental interference. *Fabio*, 414 A.2d at 89. In its analysis, the court relied heavily on the fact that the legislature had abolished the crime of adultery. *Fabio*, 414 A.2d at 89. After recognizing that the right of privacy had been implicated, the Pennsylvania court then concluded that the civil service commission had shown a compelling state interest that outweighed Officer Fabio's right of privacy. *Fabio*, 414 A.2d at 87. Similarly, because we

hold that the Texas right of privacy has been implicated, we must now determine whether the City met its burden on summary judgment to show a compelling governmental interest.

### C. The City's Governmental Interest

 The right of privacy, like other constitutional freedoms, is presumptive and is not absolute. In particular cases, it may give way to overriding governmental interests. *TSEU*, 746 S.W.2d at 205. The right of privacy does not imply that the state is wholly disabled from promoting the majority's views of morality. However, there are limits on our government's ability to invade the most private aspects of its citizens' lives. Consequently, once the privacy right is implicated, the burden shifts and the government must show (i) its action is necessary to achieve a compelling governmental interest and (ii) that interest can be achieved by no less intrusive, more reasonable means. *TSEU*, 746 S.W.2d at 205.

 A city may have interests as an employer in regulating the conduct of its employees that differ significantly from those it possesses in connection with its regulation of the public generally. *TSEU*, 746 S.W.2d at 205. In particular, Texas courts have shown deference to the important interests served by public agencies that are directly involved in the compelling state goal of protecting the safety of the general public. *See Richardson v. City of Pasadena*, 500 S.W.2d

**6.** Other state courts have also addressed the extent of police officers' right of sexual privacy. *See Puzick v. City of Colorado Springs*, 680 P.2d 1283, 1287 (Colo.Ct.App.1983) (failing to decide whether off-duty, private sexual acts are protected by the right of privacy, but finding a compelling state interest that would override the right even if it existed); *In re Raynes*, 215 Mont. 484, 698 P.2d 856, 860–61 (1985) (recognizing that an officer's off-duty, private sexual conduct invokes the right of privacy under the Montana and United States constitutions).

Several state courts have also addressed the issue of the right of sexual privacy more generally. *See Iowa v. Pilcher*, 242 N.W.2d 348, 359 (Iowa 1976) (holding sodomy statute unconstitutional as an invasion of fundamental rights, such as the personal right of privacy); *Kentucky v. Wasson*, 842 S.W.2d 487, 496 (Ky.1992) (holding that "immorality in private which does 'not oper-

ate to the detriment of others,' is placed beyond the reach of state action by the guarantees of liberty in the Kentucky Constitution"); *New Jersey v. Saunders*, 75 N.J. 200, 381 A.2d 333, 339–41 (1977) (holding that a state law prohibiting fornication impinges upon the rights of privacy provided by the state and federal constitutions); *New York v. Onofre*, 51 N.Y.2d 476, 434 N.Y.S.2d 947, 950–51, 415 N.E.2d 936, 940–41 (1980) (holding that the right of privacy extends to people who engage in "deviant" sexual conduct "so long as the decisions are voluntarily made by adults in a noncommercial, private setting"), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981); *Pennsylvania v. Bonadio*, 490 Pa. 91, 415 A.2d 47, 50–51 (1980) (holding that the state and federal constitutions protect the right of consenting adults to engage in private sexual conduct).

175, 177 (Tex.Civ.App.—Houston [14th Dist.] 1973), *rev'd on other grounds,* 513 S.W.2d 1 (Tex.1974). Despite this deference, the trial court here held that as a matter of law the City's objectives were not compelling. Such determinations as to the nature of the City's objectives and the reasonableness of the means used to achieve them are properly made in the trial court. *TSEU,* 746 S.W.2d at 206.

■ Even granting special deference to the policy choices of the police department, we must reject the City's asserted justifications because its goals could be achieved by less intrusive, more reasonable means. The City argued that its actions were justified as efforts to (i) maintain the respect and trust of other officers for their sergeants and (ii) protect the efficiency and morale of the department. Nevertheless, the City admits it had no written policies or guidelines pertaining to employees' off-duty sexual conduct. Without written guidelines and policies limiting the government's actions when those actions directly intrude on the core of a person's constitutionally protected privacy interests, the chances are too great that the government may act arbitrarily or capriciously. Such an unbounded, standardless inquiry, even if founded upon a legitimate governmental interest, cannot withstand the heightened scrutiny with which we must view the City's actions. The legitimate regulation of employee fitness and competence cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

The danger presented by such standardless inquiries is readily apparent from the record presented to the Commission. When asked at the Commission hearing whether Pollard would be promoted to lieutenant if he were to have an affair with a fellow officer's wife, the police chief stated that he could not make that determination because he must consider each situation on a case-by-case basis. However, in appellee's case, the police chief stated that this relationship "completely blind[ed] [him] to any other aspects of [appellee's] police career." From his testimony, it appears the police chief would be willing to consider mitigating factors such as objective qualifications in Pollard's case, but he is unwilling to consider such factors in appellee's case. Further, the police chief expressed no concern about a possible promotion for Pollard, even though Pollard willfully violated the police department's nepotism policy. Nor is there any evidence indicating that either Olson or Pollard was reprimanded for violating the department's nepotism policy. In comparison, appellee at most violated an unwritten, standardless policy grounded solely in the police chief's personal moral standards.

■ If the City chooses to regulate its employees' sexual morality, it must at least do so through regulations carefully tailored to meet the City's specified needs. Without narrowly tailored regulations, the risk is too great that an infringement of this important constitutionally protected right might be justified on the basis of individual prejudice and bias toward the protected conduct. It is important to note that private prejudice is never a cognizable governmental interest. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 448, 105 S.Ct. 3249, 3258–59, 87 L.Ed.2d 313 (1985). In fact, the very purpose of constitutional protection of individual liberties is to prevent capricious coercion by the majority.

Furthermore, we conclude the City failed to establish that appellee's actions had a significant effect on the police department. The City's evidence of its compelling governmental interest was limited to (i) a single note posted on a bulletin board, (ii) testimony that some officers had discussed the situation while on duty, and (iii) conclusory statements by the Chief and other supervisors that appellee could never gain respect from subordinates. We conclude, on the basis of the undisputed facts, the City's alleged harm is not sufficiently compelling to warrant its invasion of appellee's privacy. Moreover, we find it significant that the City did not offer any evidence regarding individual rank-and-file police officers' ability to work for appellee. Nor did it offer any evidence indicating that morale or discipline had actually been adversely affected after the relationship became common knowledge in the department.

In fact, the City's own witnesses testified that morale and discipline in the department had remained unchanged since the disclosure.

The City failed to show that appellee's constitutionally protected, private, off-duty, personal activities had affected his on-the-job performance or the department's morale. Nor has the City shown that it had any specific regulations related to the complained-of conduct. Consequently, we hold the City's reliance on these private, non-job-related considerations in passing over appellee for promotion violated appellee's protected constitutional right of privacy. Accordingly, the City's failure to promote appellee cannot be upheld. Because the summary judgment evidence failed to establish that the City's policy was narrowly tailored and the City's justifications were sufficiently compelling, we need not determine whether the City is prohibited from ever questioning or considering the sexual morality of its employees.

Because we hold that the Texas Constitution protects the complained-of conduct, we need not analyze the protection provided by the United States Constitution. We overrule the first and second points of error as they relate to the state constitutional claims.

### 4. Attorney's Fees

After the trial court granted appellee's motion for summary judgment on the constitutional question, the parties moved for summary judgment on the remaining issue of attorney's fees. In the third and fourth points of error, the City contends the trial court erred in (i) awarding attorney's fees to appellee and (ii) denying its attorney's fees.

■ Attorney's fees are not recoverable in an action unless provided for by statute or by contract between the parties. *First Nat'l Bank v. Anderson Ford–Lincoln–Mercury, Inc.*, 704 S.W.2d 83, 85 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The local government code provides for recovery of attorney's fees to the prevailing party in the appeal of a civil-service-commission decision to the trial court. TEX.LOCAL GOV'T CODE ANN. § 143.015(c) (Vernon 1988). Because the City did not prevail in the trial court or

in this Court, it is not entitled to recover its attorney's fees. Accordingly, we overrule the fourth point of error.

■ In the third point of error, the City argues (i) appellee did not segregate his attorney's fees attributed to a claim appellee voluntarily nonsuited from the fees attributed to his successful claim in the trial court, and (ii) the time spent and rates charged are excessive. In his summary-judgment proof, appellee produced three affidavits. One of these is an affidavit from appellee's attorney, Robert Richardson, attesting to his hourly rate and the time spent on the case. Richardson's affidavit concludes that the reasonable value of his services through trial is $59,609.37. The other two affidavits are from local attorneys attesting to the reasonableness of Richardson's fees. The first of these stated that a reasonable fee through trial would be $109,000. The second stated that a reasonable fee through trial would be between $68,125 and $102,187.50. The City produced summary-judgment evidence indicating a reasonable attorney's fee through trial would be between $8,750 and $9,625. In its final judgment, the trial court awarded appellee $23,843.75 for his attorney's fees through trial.

■ An attorney's affidavit can sufficiently establish reasonable attorney's fees on a motion for summary judgment. *American 10–Minute Oil Change v. Metropolitan Nat'l Bank*, 783 S.W.2d 598, 602 (Tex.App.—Dallas 1989, no writ). However, the nonmovant may create a fact issue by filing an affidavit contesting the reasonableness of the movant's attorney's fees. *General Specialties, Inc. v. Charter Nat'l Bank*, 687 S.W.2d 772, 774 (Tex.App.—Houston [14th Dist.] 1985, no writ). Here, the City's affidavits challenged the reasonableness of Richardson's fees. The City raised fact issues regarding (i) the reasonableness of Richardson's hourly rate and (ii) the segregation of hours attributable to the claim for which recovery of attorney's fees was authorized. Because the City raised issues of material fact, summary judgment was improper. Accordingly, we sustain the City's third point of error.

We affirm the trial court's judgment as it relates to the state constitutional issue. We

reverse the trial court's judgment as it relates to attorney's fees and remand for a trial on the issue of attorney's fees.